

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-31-2009

# NJ Dept Env Prot v. NRC

Precedential or Non-Precedential: Precedential

Docket No. 07-2271

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"NJ Dept Env Prot v. NRC" (2009). *2009 Decisions.* Paper 1610.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1610

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-2271

_____

NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

Petitioner

v.

UNITED STATES NUCLEAR REGULATORY
COMMISSION; AMERGEN ENERGY COMPANY, LLC

Respondent

_____

Petition for Review of an Order
by the United States Nuclear Regulatory Commission
(NRC-1 : 50-0219-LR)

_____

Argued on December 10, 2008

Before:  McKEE, SMITH and ROTH, Circuit Judges

( Opinion filed March 31, 2009)

Anne Milgram, Esquire
Attorney General of New Jersey
Nancy Kaplen, Esquire
Assistant Attorney General of Counsel
Ellen B. Balint, Esquire
Eileen P. Kelly, Esquire  **(Argued)**
Valerie Anne Gray, Esquire
John A. Covino, Esquire
Deputy Attorney Generals
R. J. Hughes Justice Complex
P. O. Box 093
25 Market Street
Trenton, New Jersey   08625

                      Counsel   for   Petitioner   New   Jersey
                      Department of Environmental Protection


Ronald J. Tenpas, Esquire
Assistant Attorney General
Karen D. Cyr, Esquire
General Counsel
John F. Cordes, Jr., Esquire  **(Argued)**
Solicitor
Charles E. Mullins, Esquire
Senior Attorney
E. Leo Slaggie, Esquire

Deputy Solicitor
U. S. Nuclear Regulatory Commission
11555 Rockville Pike
One White Flint North
Rockville, MD   20852-2738

Tamara N. Rountree, Esquire
Environment & Natural Resources Division
P. O. Box 23795
L'Enfant Plaza Station
Washington, D. C.  20026

        Counsel for Respondent Nuclear
        Regulatory Commission


J. Bradley Fewell, Esquire
Associate General Counsel
Exelon Business Services Company
Brad Fagg, Esquire  **(Argued)**
Kathryn M. Sutton, Esquire
Martin J. O'Neill, Esquire
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue, N. W.
Washington, D. C.   20004

        Counsel for Private Respondent AmerGen
        Energy Company, L.L.C.

3

Ellen C. Ginsberg, Esquire
Michael A. Bauser, Esquire
Anne W. Cottingham, Esquire
Nuclear Energy Institute, Inc.
1776 I Street, N.W., Suite 400
Washington, D. C.   20006-3708

Counsel for Amicus Curiae Nuclear
Energy Institute, Inc. for Respondent
Nuclear Regulatory Commission

O P I N I O N

**ROTH,** Circuit Judge:

The issue presented by this appeal is whether the Nuclear Regulatory Commission (NRC), when it is reviewing an application to relicense a nuclear power facility, must examine the environmental impact of a hypothetical terrorist attack on that nuclear power facility.  The New Jersey Department of Environmental Protection (NJDEP) contends that the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq*, requires the analysis of the impact of such an attack. NJDEP has petitioned for review of an NRC decision denying its request to intervene in relicensing proceedings for the Oyster Creek Nuclear Generating Station (Oyster Creek).  The NRC concluded that terrorist attacks are "too far removed from the natural or expected consequences of agency action" to require

4

an environmental impact analysis and that, in any event, it had already addressed the environmental impact of a potential terrorist act at Oyster Creek through its Generic Environmental Impact Statement and site-specific Supplemental Environmental Impact Statement. We agree with the NRC and will deny the petition.

## I. **BACKGROUND**

### A. **Statutory and Regulatory Framework**

The Atomic Energy Act of 1954 (AEA), as amended, 42 U.S.C. § 2011 *et seq.*, establishes a "comprehensive regulatory framework for the ongoing review of nuclear power plants located in the United States." Sections 103 and 104(b) of the AEA authorize the NRC to issue licenses to operate commercial power reactors. 42 U.S.C. §§ 2133, 2134(b). Section 103 limits licenses to forty-year terms but provides for renewal of nearly-expired licenses. 42 U.S.C. § 2133. By regulation, the NRC may renew a license for up to twenty years. *See* 10 C.F.R. § 54.31.

Two sets of regulatory requirements govern the NRC's review of license renewal applications. Under 10 C.F.R. Part 54, the NRC conducts a health and safety review focused on "the detrimental effects of aging"on the plant. *See* Nuclear Power Plant License Renewal: Revisions, 60 Fed. Reg. 22,461, 22,464 (May 8, 1995).

Under 10 C.F.R. Part 51, the NRC completes a NEPA-based environmental review, focusing on the potential impacts

of twenty additional years of operation. NEPA is a procedural statute that does not mandate particular substantive results. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989). Rather, it is designed "to insure a fully informed and well-considered decision" in the examination of potential environmental impacts of a proposed agency action. *Vermont Yankee*, 435 U.S. at 558. NEPA "merely prohibits uninformed—rather than unwise—agency action." *Robertson*, 490 U.S. at 351. In addition, NEPA review should be consistent with NEPA's "national policy [to] encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. NEPA's "twin aims" are to "'place[] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action' [and to] ensur[e] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978)).

By regulation, the NRC has divided the environmental requirements for license renewal into generic and plant-specific issues. This division resulted from "a systematic inquiry into the environmental impacts of refurbishment activities associated with license renewal and the environmental impacts of continued operation during the renewal period (up to 20 years for each licensing action)." Notice of Intent to Prepare an Environmental Impact Statement for the License Renewal of Nuclear Power Plants and to Conduct Scoping Process, 68 Fed. Reg. 332909, 33209 (June 3, 2003). The NRC analyzed "[t]he significance of environmental impacts . . . for each of nearly 100

6

issues [and] categorized which of these analyses could be applied to all plants and whether the additional mitigation measures would be warranted for each environmental issue." *Id.* Ultimately, "[o]f the 92 issues analyzed, 69 were resolved generally, 21 require a further site-specific analysis that applicants are required to address, and 2 require a site-specific assessment by the NRC." *Id.*

The NRC's "Generic Environmental Impact Statement for License Renewal of Nuclear Plants," Final Report, Vol. I (May 1996) (GEIS), addresses issues that are common to all nuclear plants. These have been designated "Category 1" issues. GEIS at 1-5, 1-6. Of particular note here, the GEIS reviews the risk of sabotage to nuclear power plants. The NRC has determined from this review that the risk is small and is provided for in the consideration of internal severe accidents:

> The regulatory requirements under 10 CFR part 73 [i.e., "Physical Protection of Plants and Materials"] provide reasonable assurance that the risk from sabotage is small. Although the threat of sabotage events cannot be accurately quantified, the commission believes that acts of sabotage are not reasonably expected. Nonetheless, if such events were to occur, the commission would expect that resultant core damage and radiological releases would be no worse than those expected from internally initiated events.

7

> Based on the above, the commission concludes that the risk from sabotage is small and additionally, that the risks f[ro]m other external events[] are adequately addressed by a generic consideration of internally initiated severe accidents.

GEIS at 5-18. The NRC expressly incorporated the GEIS's findings related to internal severe accidents into the NRC's environmental review regulations. *See* 10 C.F.R. Part 51 Subpt. A, App. B, Table B-1.

Environmental impacts not discussed in the GEIS are designated "Category 2" issues and must be addressed in an applicant's environmental report. *Id.* § 51.53(c)(3)(ii). Ultimately, NRC staff prepares a site-specific Supplemental Environmental Impact Statement (SEIS) for each plant. *Id.* § 51.95(c). The SEIS includes evaluations of site-specific Category 2 issues—including a consideration of "severe accident mitigation alternatives" (SAMAs) for those issues that have not previously been considered—and "new and significant information" regarding Category 1 issues.

As a part of the relicensing review process, NRC regulations permit anyone with an "interest" in a licensing proceeding to obtain a hearing on admissible safety and environmental "contentions." *See* 10 C.F.R. § 2.309(a), (d). Such a person must file a petition to intervene demonstrating standing and that "the issue raised . . . is within the scope of the proceeding." *Id.* § 2.309(f)(1)(iii). Unless a party obtains a

waiver from the NRC, regulations are not "subject to attack" during adjudications.  *Id.* § 2.335(a).

## B.  Factual and Procedural Background

On July 22, 2005, the AmerGen Energy Company, LLC (AmerGen) applied to the NRC to renew its operating license at Oyster Creek for an additional twenty years.  Oyster Creek is located adjacent to Barnegat Bay in Lacey and Ocean Townships, Ocean County, New Jersey.  Oyster Creek's current license expires in April 2009.  On September 15, 2005, the NRC published a notice of opportunity for hearing in the *Federal Register*.  *See* Notice of Opportunity for Hearing Regarding Renewal of Facility Operating License No. DRP-16 for an Additional 20-Year Period, 70 Fed. Reg. 54,585 (Sept. 15, 2005).

On November 14, 2005, NJDEP filed a petition to intervene raising three contentions, only one of which it has raised in the appeal before us.[1]  NJDEP challenges the NRC's failure to prepare an environmental impact statement (EIS) to study the effects of an aircraft attack on Oyster Creek.  NJDEP contends that such an EIS should have contained, within its

---

[1]    New Jersey's other two contentions involved (1) the appropriate calculation of metal fatigue for the reactor coolant pressure boundary and associated components and (2) whether Oyster Creek had sufficient back-up power to operate during a blackout.

SAMAs analysis, a design basis threat (DBT) analysis[2] and an analysis of mitigation alternatives for core melt sequences likely to result from an aircraft attack. The claims were reviewed by the Atomic Safety and Licensing Board (Board), which "held that terrorism and 'design basis threat' reviews, while important and ongoing, lie outside the scope of NEPA in general and of license renewal in particular." *See In re Amergen Energy Co.*, 65 N.R.C. 124, 128 (2007).

NJDEP appealed this decision to the NRC, which denied the claim. *Id.* at 126. The NRC agreed with the Board that terrorism concerns are security issues, which are not addressed during license renewal because they do not relate to the aging of the facility. *Id.* The NRC also found that NEPA "'imposes no legal duty on the NRC to consider intentional malevolent acts'" because such acts are "'too far removed from the natural or expected consequences of agency action.'" *Id.* at 129 (quoting the Board decision). Finally, the NRC found that a terrorism review would be redundant because (1) "the NRC has undertaken extensive efforts to enhance security at nuclear facilities," which it characterized as the best mechanism to protect the public; *id.* at 130; (2) the GEIS had concluded that "the core damage and radiological release from [terrorist] acts would be no worse than the damage and release to be expected from internally initiated events"; *id.* at 131; and (3) in its SEIS for Oyster Creek, the NRC had performed a site-specific

---

[2]     A DBT analysis is "used to design safeguards systems to protect against acts of radiological sabotage and to prevent the theft or diversion of special nuclear material." 10 C.F.R. § 73.1.

SAMAs assessment; *id.* at 132.[3]

NJDEP filed a petition for review of the NRC's order. We have jurisdiction pursuant to 28 U.S.C. § 2342(4).

## II. **DISCUSSION**

NJDEP's petition suffers from two insurmountable flaws, each of which independently supports our denial.[4]

---

[3]    The SEIS repeated the GEIS's conclusion that "resultant core damage and radiological releases [from sabotage] would be no worse than those expected from internally initiated events." SEIS at 5-3.

[4]    The parties disagree as to the appropriate standard of review. The NRC, along with AmerGen, contends that we must apply the "arbitrary and capricious standard" required by the Administrative Procedure Act (APA). NJDEP, on the other hand, argues that we should apply a "reasonableness standard" because the NRC's decision was one of law—whether the NRC was required to perform a NEPA review. Nonetheless, NJDEP argues that even if we apply an arbitrary and capricious standard, the NRC's actions cannot be upheld.

We have maintained a dichotomy in the standard of review due an agency decision—affording deference to questions implicating agency expertise and engaging in more exacting review of legal questions—but we have never

employed a "reasonableness" standard. In *Patel v. Ashcroft*, 294 F.3d 465 (3d Cir. 2002) (superseded by statute on other grounds), we stated:

> We usually afford deference to decisions of administrative agencies when we are reviewing the agency's interpretation of a statute the agency is charged with administering. This deference recognizes the agency's expertise in addressing issues that often arise when interpreting such statutes. However, we recognize that legal issues that turn on a pure question of law not implicating the agency's expertise do not raise the same concerns under *Chevron*. Accordingly, when we are called upon to resolve pure questions of law by statutory interpretation, we decide the issue de novo without deferring to an administrative agency that may be involved.

*Id.* at 467.

Similarly, in the wake of CBS's broadcast of the Super Bowl halftime performance featuring Janet Jackson, we stated that "questions of law not within the agency's expertise—such as the FCC's determination here on [Jackson's] employment status—receive less deference under the APA than other agency conclusions." *CBS Corp. v. FCC*, 535 F.3d 167, 195 n.25 (3d Cir. 2008). On the other hand, we have held that "[o]ur standard of review of an order granting a nuclear power operating license . . . is deferential" and generally used the arbitrary and

12

First, NJDEP has not shown that there is a "reasonably close causal relationship" between the Oyster Creek relicensing proceeding and the environmental effects of a hypothetical aircraft attack. Accordingly, such an attack does not warrant NEPA evaluation. *See DOT v. Pub. Citizen*, 541 U.S. 752, 767 (2004); *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983). Second, the NRC has already considered the environmental effects of a hypothetical terrorist attack on a nuclear plant and found that these effects would be no worse than those caused by a severe accident. NJDEP has not provided any evidence to challenge this conclusion and has not demonstrated that the NRC could undertake a more meaningful analysis of the specific risks associated with an aircraft attack on Oyster Creek. *See Limerick*, 869 F.2d at 744 & n.31.

## A. Causation

---

capriciousness standard in this context. *See Limerick Ecology Action, Inc. v. NRC*, 869 F.2d 719, 728 (3d Cir. 1989).

We need not resolve whether *de novo*, "reasonableness," or arbitrary and capriciousness review is appropriate because the NRC's actions survive review under any of these standards.

In rejecting NJDEP's contention, the NRC held that "there simply is no proximate cause link between an NRC licensing action, such as [in this case] renewing an operating license, and any altered risk of terrorist attack. Instead, the level of risk depends upon political, social, and economic factors *external* to the NRC licensing process." *See In re AmerGen Energy Co.*, 65 N.R.C. at 130. NJDEP, on the other hand, asserts that the government has a duty to protect against foreseeable danger, even if that danger comes from intentional criminal conduct, and that here the risk of environmental harm caused by terrorists is foreseeable given the September 11, 2001, attacks on the World Trade Center and Oyster Creek's proximity to important urban centers.[5] NJDEP also finds significant the NRC's efforts to improve security at nuclear facilities, asserting that these efforts demonstrate the NRC's recognition that a terrorist attack is foreseeable.

The Supreme Court has spoken on two occasions regarding the circumstances in which NEPA requires an agency to prepare an EIS. The first concerned the resumption of activity at the Three Mile Island nuclear power plant after a serious accident caused a shutdown of one of the reactors. *See Metro. Edison Co.*, 460 U.S. at 768. Though no radiation was

---

[5] NJDEP did not raise Oyster Creek's proximity to important urban centers until this appeal; therefore, it should not be considered. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 262 (3d Cir. 2006). In any event, it follows from our discussion that Oyster Creek's proximity to urban centers is irrelevant to the causation analysis.

14

released in the accident, it caused widespread concern about the safety of the plant. *Id.* at 769. A group of Harrisburg residents, organized as People Against Nuclear Energy (PANE), argued that restarting the reactor would "cause both severe psychological health damage to persons living in the vicinity[] and serious damage to the stability, cohesiveness, and well-being of the neighborhood communities." *Id.* The NRC declined to take evidence on this issue, and PANE petitioned for review, arguing that both NEPA and the AEA required such an analysis. *Id.* at 770. The D.C. Circuit agreed as to NEPA, finding, "NEPA requires agencies to consider effects on health. An effect on psychological health is an effect on health. Therefore, NEPA requires agencies to consider the effects on psychological health . . .." *Id.* at 771.

The Supreme Court reversed.[6] First, the Court noted that "NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the impact or effect on the environment." *Id.* at 772. The Court held that, in order to determine when NEPA requires consideration of a particular environmental effect, agencies and reviewing courts "must look at the relationship between that effect and the change in the physical environment caused by the major federal action at issue." *Id.* at 773. The Court then explained that NEPA attaches only when there is a "reasonably close causal relationship between a change in the physical environment and

---

[6] Only the NEPA issue was before the Supreme Court; neither party contested the D.C. Circuit's holding with regard to the AEA. *Id.* at 771 n.5.

the effect at issue." The Court likened this relationship to "the familiar doctrine of proximate cause from tort law." *Id.* at 774. In applying this standard to the case before it, the Court observed that the renewed operation of the reactor would affect the environment, particularly in the release of low levels of radiation, increased fog, the release of warm water into the Susquehanna River, and the potential results of a nuclear accident.[7] *Id.* at 775. It then observed that the NRC had considered all of these effects. The Court, however, found damage to psychological health caused by the perception of a risk of a nuclear accident too attenuated: "In a causal chain from renewed operation . . . to psychological health damage, the element of risk and its perception by PANE's members are

necessary middle links. We believe that the element of risk lengthens the causal chain beyond the reach of NEPA." *Id.*

---

[7] With regard to the potential results of a nuclear accident, the Court indicated that the environmental effects of an accident arising from the operation of a nuclear facility are direct effects whereas here the Court was considering the effect of fear of the risk occurring: "We emphasize that in this case we are considering effects caused by the risk of an accident. The situation where an agency is asked to consider effects that will occur if a risk is realized, for example, if an accident occurs at [Three Mile Island], is an entirely different case." *Id.* at 775 n.9.

16

The Supreme Court again discussed NEPA's causation requirement in *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004). *Public Citizen* concerned the operation of Mexican tractor-trailer trucks in the United States. Prior to 1982, these trucks were certified to operate in the United States by the Interstate Commerce Commission. In 1982, Congress suspended this certification procedure in light of concerns about Mexico's discriminatory treatment of American trucks operating in Mexico. *Id.* at 759. The United States agreed, however, as part of the North American Free Trade Agreement (NAFTA) to phase out the moratorium. *Id.*

In 1994, the President lifted the moratorium but called for new regulations related to the certification of Mexican trucks seeking to operate in the United States. Accordingly, the Federal Motor Carrier Safety Administration (FMCSA), a division of the Department of Transportation, published proposed safety regulations and procedures for the certification of Mexican trucks. The FMCSA also prepared an environmental assessment (EA) focusing on the effects of its proposed regulations. *Id.* at 760–62. The EA did not consider the environmental impact of increased Mexican truck traffic because the FMCSA attributed this increase not to the regulations but to NAFTA and the President's decision to lift the moratorium. *Id.* at 761. A citizen group petitioned for review, arguing that NEPA required such an analysis. *Id.* at 766.

The Supreme Court upheld the FMCSA's decision. The Court noted that an EIS is required only for "'major Federal actions,'" defined to include "'actions with effects that may be

17

major and which are potentially subject to Federal control and responsibility.'" *Id.* at 763 (quoting 40 C.F.R. § 1508.18)).  The Court then noted that "effects" were limited by regulation to (1) "[d]irect effects, which are caused by the action and occur at the same time and place," and (2) "indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* at 764 (internal quotation marks and citation omitted).

The Court concluded that the increase in Mexican truck traffic was not an effect of the FMCSA's action.  First, the Court noted that the FMCSA does not have the authority to exclude Mexican trucks from the United States.  Rather, pursuant to congressional mandate, the FMCSA must certify every truck that can meet the FMCSA's regulations.  *Id.* at 766.  Next, the Court considered the causal relationship between the agency action and the environmental impact, as required by *Metropolitan Edison*.  The Court characterized the causation at issue as "'but for' causation, where an agency's action is considered a cause of an environmental effect even when the agency has no authority to prevent the effect."  It declared that this form of "but for" causation is "insufficient to make an agency responsible for a particular effect under NEPA."  *Id.* at 767.

The *Public Citizen* Court also rejected the petitioner's argument under the rule of reason, stating that agencies need not prepare an EIS when it would serve "no purpose" under NEPA.  *Id.*  It noted NEPA's twin aims:  (1) to force agencies to

18

consider environmental impact as part of its decision making, and (2) to make information available to the public so that it can play a role in the decision making process. Because the FMCSA cannot prevent the entry of Mexican trucks, an EIS addressing increased traffic would not affect its decision making. *Id.* at 768. Moreover, the public information purpose would not be served since FMCSA could not react to the input received from the public. *Id.* at 768–69. Accordingly, the Court agreed with the FMCSA that "the legally relevant cause of the entry of the Mexican trucks is *not* FMCSA's action, but instead the actions of the President in lifting the moratorium and those of Congress in granting the President this authority." *Id.* at 769.

NJDEP argues that neither *Metropolitan Edison* nor *Public Citizen* is apposite, asserting that those decisions involved cause and effect relationships that are far more attenuated than the one presented here. We disagree. The Supreme Court has directed that we "draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." *Id.* at 767 (quoting *Metro. Edison*, 460 U.S. at 774 n.7). In the cases, this line appears to approximate the limits of an agency's area of control. For example, in *Metropolitan Edison*, the NRC could control the nuclear facility and its operation but not how individuals perceived the risks of renewed operation and the possibility of another accident; therefore, these risks were too remote to require a NEPA analysis. Likewise, in *Public Citizen*, the FMCSA controlled the certification process, but it could not control the admission or volume of Mexican trucks; the FMCSA's role was limited to certification.

19

In the instant case, the NRC controls whether equipment within a facility is suitable for continued operation or could withstand an accident, but it has no authority over the airspace above its facilities, which is largely controlled by Congress and the Federal Aviation Administration (FAA).  The NRC has explicitly noted its limited ability to address airborne threats, articulating its consistent view that "security from terrorist attacks on nuclear facilities [i]s best approached by enhancing aviation security, including intelligence gathering and security at airports and on airplanes." *Riverkeeper, Inc. v. Collins*, 359 F.3d 156, 161 (2d Cir. 2004); *cf. Glass Packaging Institute v. Reagan*, 737 F.2d 1083, 1092 (D.C. Cir. 1984) ("NEPA is meant to supplement federal agencies' other nonenvironmental objectives, not to transplant specific regulatory burdens from those expert agencies otherwise authorized to redress specific nonenvironmental problems and pointlessly to reimpose those objectives on other unqualified agencies.").  This view is shared by other federal agencies.  *See* Richard A. Meserve, *Statement Submitted by the Nuclear Regulatory Commission to the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce* 5 (2003) (noting that when there were reported threats to the airspace above nuclear facilities, the FAA and the Department of Defense, rather than the NRC, responded to protect the airspace).

NRC's lack of control over airspace supports our holding that a terrorist aircraft attack lengthens the causal chain beyond the "reasonably close causal relationship" required by those cases.  Indeed, an aircraft attack on Oyster Creek requires at

20

least two intervening events:  (1) the act of a third-party criminal and (2) the failure of all government agencies specifically charged with preventing terrorist attacks.  We conclude that this causation chain is too attenuated to require NEPA review. Moreover, this conclusion is supported by traditional tort law concepts of causation.[8]

According to the Restatement (Second) of Torts, the criminal conduct of a third person is not a superseding cause of harm unless the original actor "realized or should have realized the likelihood that [an opportunity for a third person to commit a crime] might be created, and that a third person might avail himself of the opportunity."  Restatement (Second) of Torts § 448.  The comments to the section clarify the circumstances in which an actor should anticipate third-party criminal conduct: (1) situations that "afford[] temptations to which a recognizable percentage of humanity is likely to yield" and (2) situations "created at a place where persons of peculiarly vicious type are likely to be" who might yield to the temptation, even though the average individual would not do so.  *Id* § 448 cmt. b.  NJDEP has not demonstrated that either condition is present here.

---

[8]    The relevant tort law concepts are premised on the idea that the actor, the NRC in this case, engages in underlying negligent conduct.  Since cases analyzing NEPA have not focused on negligence, we assume for purposes of this analysis that NEPA differs from tort law in this regard.  *See Pub. Citizen*, 541 U.S. at 763; *Metro. Edison*, 460 U.S. at 772.

The Restatement also clarifies when "an intervening force is a superseding cause." *See id.* § 442. Section 442 lists six factors for consideration: (1) whether the third party causes harm "different in kind from that which would otherwise have resulted from the actor's negligence," (2) whether the event appears extraordinary in light of circumstances at the time, (3) whether the intervening force operates "independently of any situation created by the actor's negligence," (4) whether the intervening act is "due to a third person's act," (5) whether the third person's act is wrongful and would subject him to liability, and (6) the "degree of culpability of [the] wrongful act by [the] third party." *Id.* These factors counsel against finding the NRC's relicensing of Oyster Creek to be the proximate cause of environmental harm in a terrorist attack. The first factor cuts against the NRC because the consequences of a successful terrorist attack would be similar to the possible consequences of a severe accident. The remaining five factors, however, are in the NRC's favor. Such an attack would certainly be "extraordinary," as there has never been an airborne attack on a nuclear facility, any terrorist would be operating independently of the NRC, the intervening force would be due to a third-party terrorist, a terrorist attack is wrongful, and the degree of culpability of the terrorist would far exceed that of the NRC.

Our decision in *Port Authority of New York & New Jersey v. Arcadian Corp.,* 189 F.3d 305 (3d Cir. 1999), although decided under state law, further supports our conclusion. *Port Authority* arose in the wake of the 1993 World Trade Center bombing. *Id.* at 309. The plaintiffs alleged that the defendant

22

fertilizer manufacturers were negligent in the manufacture and sale of the fertilizer used in the attack. *Id.* at 310. We held "as a matter of law that the World Trade Center bombing was not a natural or probable consequence of any design defect in defendants' products. In addition, the terrorists' actions were superseding and intervening events breaking the chain of causation." *Id.* at 319; *see also Gaines-Tabb v. ICI Explosives, USA, Inc.*, 160 F.3d 613, 618 (10th Cir. 1998) (after Oklahoma City bombing, defendant fertilizer manufacturer held not responsible for the criminal conduct of bomber in using the fertilizer to make the bomb). Similarly, here, a terrorist attack on a nuclear facility would be a superseding cause of the environmental effects felt after an attack.

The government agencies specifically charged with preventing an airborne terrorist attack would also serve as intervening forces. As noted above, the NRC's sphere of authority is limited to the facilities themselves and the equipment within them. A terrorist attack on an NRC-licensed facility would require, at a minimum, a failure by the FAA and the Department of Defense to protect and defend the facility.

An additional factor counsels against finding that the NRC's relicensing of the Oyster Creek facility would be the proximate cause of environmental harm in the event of an airborne attack. In insisting that we "draw a manageable line" when imposing NEPA responsibilities, the *Metropolitan Edison* Court noted the limited time and resources of federal agencies and warned that "[t]he scope of the agency's inquiries must remain manageable if NEPA's goal of [ensuring] a fully

23

informed and well considered decision is to be accomplished." *Id.* at 774 n.7, 776 (internal quotation marks omitted). Applied to the case before it, the Court indicated that, if agencies were required to assess psychological health damage associated with increased risk, agencies would "expend considerable resources" on issues "not otherwise relevant to their congressionally assigned functions" and "resources may be spread so thin that agencies are unable adequately to pursue protection of the physical environment and natural resources." *Id.*

Similarly, if NEPA required the NRC to analyze the potential consequences of an airborne attack, the NRC would spend time and resources assessing security risks over which it has little control and which would not likely aid its other assigned functions to assure the safety and security of nuclear facilities. Moreover, an analysis of the risks of a terrorist attack on Oyster Creek, as well as NJDEP's arguments concerning Oyster Creek's status as a particularly vulnerable terrorist target, implicate security concerns that are broader than those at issue under NEPA. For example, security decisions must be centralized rather than made on a site-specific basis since those in charge of each site may have differing ideas over how to spread limited resources. This policy is reflected in NRC regulations, which separate its health and safety review, conducted through rulemaking under the APA, from the environmental review required by NEPA. *See* 10 C.F.R. Parts 51, 54; *In re AmerGen Energy Co.*, 65 N.R.C. at 130. Likewise, security reviews involve analysis of sensitive information not available to the public, while NEPA requires public participation and transparency. *See In re Private Fuel Storage*, CLI-02-023,

24

56 N.R.C. 340 (Dec. 18, 2002).[9]

In holding that there is no "reasonably close causal relationship" between a relicensing proceeding and the environmental effects of an aircraft attack on the licensed facility, we depart from the reasoning of the Ninth Circuit Court of Appeals in *San Luis Obispo Mothers for Peace v. NRC*, 449 F.3d 1016 (9th Cir. 2006). The *Mothers for Peace* court held that, given "the policy goals of NEPA and the rule of reasonableness that governs its application, the possibility of terrorist attack is not so 'remote and highly speculative' as to be beyond NEPA's requirements." *Id.* at 1031. We note, initially, that *Mothers for Peace* is distinguishable on the ground that it

---

[9]    We do not mean to suggest that the NRC has no obligation to consider how to strengthen nuclear facilities to prevent and minimize the effects of a terrorist attack; indeed, the AEA gives broad discretion over the safety and security of nuclear facilities. *See* 42 U.S.C. § 2011 *et seq.* Though the sufficiency of its efforts is not before us, we note that the NRC considered and implemented changes pursuant to the AEA to address the threats of a terrorist attack following the attacks of September 11, 2001. *See* Design Basis Threat, Final Rule, 10 C.F.R. part 73 (2007). In *Metropolitan Edison*, however, the Supreme Court made it clear that an agency's obligations *under NEPA* must be more manageable given the limited resources of federal agencies and the fact that some environmental review might "not [be] otherwise relevant to their congressionally assigned functions." 460 U.S. at 776.

25

involved the proposed construction of a new facility—a change to the physical environment arguably with a closer causal relationship to a potential terrorist attack than the mere relicensing of an existing facility. *See id.* at 1021. More centrally, however, we disagree with the rejection of the "reasonably close causal relationship" test set forth by the Supreme Court and hold that this standard remains the law in this Circuit.[10] We also note that no other circuit has required a NEPA analysis of the environmental impact of a hypothetical

---

[10]  The *Mothers for Peace* court attempted, unsuccessfully in our view, to distinguish *Metropolitan Edison* by characterizing that case as involving a three step causal chain: "(1) a major federal action; (2) a change in the physical environment, and (3) an effect." *Id.* at 1029. According to the Ninth Circuit, *Metropolitan Edison* "was concerned with the relationship between events 2 and 3," where event two was "the change in the physical environment, or increased risk of accident resulting from the renewed operation of a nuclear reactor" and event three was the "decline in the psychological health of the human population." *Id.* In contrast, the Ninth Circuit characterized the case before it as involving "the disputed relationship . . . between events 1 and 2," where step one was "the federal act, or the licensing of the Storage Installation" and event two was the "change in the physical environment, or the terrorist attack." *Id.* at 1030. It therefore held that the "reasonably close causal relationship" test from *Metropolitan Edison* did not apply and, instead, created a test requiring agencies to consider under NEPA all events not "remote and highly speculative." The Ninth Circuit made no mention of *Public Citizen*.

26

terrorist attack.  *See Mid States Coalition for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 544 (8th Cir. 2003) (holding that agency did not err in declining to reopen record for construction of new rail lines in light of terrorist attacks of September 11, 2001); *Limerick Ecology Action v. NRC*, 869 F.2d 719, 743–44 (3d Cir. 1989) (upholding NRC decision not to analyze risks of sabotage under NEPA where petitioner did not propose a meaningful way to analyze the risk); *Glass Packaging Inst.*, 737 F.2d at 1091 (upholding agency decision not to consider possibility that a "deranged criminal" might tamper with bottles)*; City of New York v. Dep't of Transp.*, 715 F.2d 732, 750 (1983) (deferring to agency's conclusion that risks of sabotage "were too far afield for consideration" in the NEPA analysis of regulation governing highway shipment of radioactive material).

Finally, NJDEP's argument concerning the relevance of the NRC's other efforts to prevent terrorist attacks is misplaced. As the NRC notes, even the Ninth Circuit Court of Appeals has held that precautionary actions to guard against a particular risk do not trigger a duty to perform a NEPA analysis. *See Ground Zero Ctr. for Non-Violent Action v. Dep't of the Navy*, 383 F.3d 1082, 1090–91 (9th Cir. 2004) (fact that the Navy took potential Trident missile accident into account when planning base layout did not mean, in and of itself, that Navy had to prepare NEPA review outlining effects of that potential accident).

In sum, the NRC correctly concluded that the relicensing of Oyster Creek does not have a "reasonably close causal relationship" with the environmental effects that would be

27

caused in the event of a terrorist attack.

## B. The NRC'S Prior Analysis of the Terrorism Threat

Even if NEPA required an assessment of the environmental effects of a hypothetical terrorist attack on a nuclear facility, the NRC has already made this assessment. As described above, the GEIS addresses the risks associated with a terrorist attack, stating that "estimates of risk from sabotage" are impossible to quantify but nonetheless characterizing the risks as "small." GEIS at 5-18. The GEIS goes on to say that, should the unlikely event occur, the effects would be "no worse than those expected from internally initiated events." *Id.* The NRC rules codify these generic findings, and by regulation, license renewal applicants are excused from discussing generic issues in their environmental reports. *See* 10 C.F.R. § 51.53(c)(3)(i); *id.* Part 51 Subpt. A, App. B, Table B.

Generic analysis "is clearly an appropriate method of conducting the hard look required by NEPA." *Baltimore Gas*, 462 U.S. at 101 (internal quotation marks omitted). Indeed, it is "hornbook administrative law that an agency need not—indeed should not—entertain a challenge to a regulation" in an individual adjudication. *Tribune Co. v. FCC*, 133 F.3d 61, 68 (D.C. Cir. 1998). NJDEP's contention challenges the NRC's generic findings, essentially arguing that certain characteristics of Oyster Creek make the risk of a terrorist attack more than "small" and the environmental effects of a terrorist attack

28

somehow different from "those expected from internally initiated events." These arguments thus amount to collateral attacks on the licensing renewal regulations, and the proper way to raise them would have been in a petition for rulemaking or a petition for a waiver based on "special circumstances." *See* 10 C.F.R. §§ 2.335, 2.802.[11]

Moreover, the NRC prepared a SEIS that analyzed alternatives at Oyster Creek to mitigate severe accidents. *See* SEIS at 5-3 through 5-12. Accordingly, the GEIS and SEIS together provide both generic and site-specific analyses of potential environmental impacts at Oyster Creek arising from terrorist attacks. New Jersey has never explained how or why an aircraft attack on Oyster Creek would produce impacts that are different from severe accidents and has not provided any evidence that the NRC could engage in a meaningful analysis of the risks of an attack. Instead, NJDEP argues, quoting our decision in *Limerick Ecology Action v. NRC*, that the NRC's "mere assertion of unquantifiability" does not immunize it from having to conduct a NEPA analysis. *See* 869 F.2d at 744 n.31. This is a true statement of the law, but it ignores our holding in *Limerick* that the burden is on the petitioner to demonstrate that

---

[11]    A recurring theme running through NJDEP's arguments is its concern that Oyster Creek's design increases the risk of any harm resulting from a terrorist attack. If NJDEP had wished, however, to pursue a position that the Oyster Creek plant is obsolete, NJDEP should have sought a waiver of the usual licensing procedures, as set out above, so that this complaint could be made.

29

the NRC could evaluate risks more meaningfully than it has already done.  *See id.* at 744 n.31.  NJDEP has not met its burden here.

## III.    <u>CONCLUSION</u>

Because NJDEP did not present an admissible contention before the NRC, concerning the environmental effects of a hypothetical aircraft attack on Oyster Creek, we will deny the petition for review.