PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1472
_____

TINICUM TOWNSHIP, PENNSYLVANIA,
an incorporated first class township;
COUNTY OF DELAWARE, PENNSYLVANIA,
a political subdivision of the
Commonwealth of Pennsylvania;
THOMAS J. GIANCRISTOFORO, individually and
in his capacity as President of the Tinicum Township
Board of Commissioners;
DAVID McCANN, an individual,

Petitioners

v.

UNITED STATES
DEPARTMENT OF TRANSPORTATION;
SECRETARY OF TRANSPORTATION;
FEDERAL AVIATION ADMINISTRATION;
ADMINISTRATOR,
FEDERAL AVIATION ADMINISTRATION;
CARMINE GALLO,
Regional Administrator, FAA Eastern Region,

Respondents

CITY OF PHILADELPHIA,

Intervenor-Respondent

_____

On Petition for Review of an Order of the
United States Department of Transportation,
Federal Aviation Administration

_____

Argued March 6, 2012

Before:  SCIRICA, AMBRO and JORDAN, *Circuit Judges*.

(Filed: July 6, 2012)

BARBARA E. LICHMAN, ESQUIRE (ARGUED)
Buchalter Nemer
18400 Von Karman Avenue, Suite 800
Irvine, California 92612

SAM S. AUSLANDER, ESQUIRE
Eckell, Sparks, Levy, Auerbach, Monte,
   Sloane, Matthews & Auslander
344 West Front Street, P.O. Box 319
Media, Pennsylvania 19063
        Attorneys for Petitioners

LANE N. McFADDEN, ESQUIRE (ARGUED)
MARY G. SPRAGUE, ESQUIRE
United States Department of Justice
Environment & Natural Resources Division

P.O. Box 23795, L'Enfant Plaza Station
Washington, D.C. 20026
        Attorneys for Respondents

W. ERIC PILSK, ESQUIRE (ARGUED)
Kaplan, Kirsch & Rockwell
1001 Connecticut Avenue, N.W., Suite 800
Washington, D.C. 20036

SCOTT J. SCHWARZ, ESQUIRE
City of Philadelphia, Law Department
One Parkway, 1515 Arch Street
Philadelphia, Pennsylvania 19102

CATHERINE M. VAN HEUVEN, ESQUIRE
Kaplan, Kirsch & Rockwell
1875 Broadway, Suite 2300
Denver, Colorado 80202
        Attorneys for Intervenor-Respondent
                   _____

                   OPINION OF THE COURT
                   _____

SCIRICA, *Circuit Judge*.

        This is an appeal of the Federal Aviation Administration's approval of a significant expansion of Philadelphia International Airport. Disputing the FAA's air

3

quality analysis, Petitioners[1] (collectively Tinicum) allege violations of the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and the consistency provision of the Airport and Airway Improvement Act, 49 U.S.C. § 47106(a)(1). Because we find the Federal Aviation Administration's decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), we will deny the petition for review.

I.

A.

Philadelphia International Airport (PHL) is the primary commercial airport for the Philadelphia region and the ninth busiest airport in the United States. Since 1999, PHL has been among the ten most delayed airports in the National Airspace System and has contributed to delays at airports throughout the United States. The delays arise from inadequate all-weather airfield capacity at PHL. The Airport's runways are too short, too close together, and too few.

Aware of these shortcomings, the City of Philadelphia, which owns and operates PHL, commenced in 2000 a study of airport facility needs. The study found that, in its current configuration, delays at PHL would increase from an average of over ten minutes per operation in 2003, which the FAA considers severe, to over nineteen minutes per operation in

---

[1] This petition for review was filed by Delaware County, Tinicum Township, and two Township residents.

2025. The FAA warns that delays of this magnitude lead both passengers and airlines to avoid an airport. To forestall these mounting delays and the consequent loss of airlines, the City sought FAA approval to expand PHL by extending two existing runways and constructing a new runway.

After receiving the City's proposal in 2003, the FAA decided to prepare an Environmental Impact Statement (EIS) in accordance with NEPA. The PHL expansion project was designated high priority and slated for expedited environmental review under the Aviation Streamlining Approval Process Act, 49 U.S.C. §§ 47171-47175, and an executive order prioritizing national transportation infrastructure projects, Exec. Order No. 13274, 67 Fed. Reg. 59,449 (Sept. 18, 2002). To comply with this national policy priority, the FAA collaborated with the City of Philadelphia, the Environmental Protection Agency (EPA), and several other interested federal and state agencies to develop a streamlining agreement that established agency roles, milestones for agency actions, and a dispute resolution procedure.

As part of the process, the FAA developed an Air Quality Analysis Protocol, which set out the scope, models, and procedures for its air quality analysis. It circulated a draft of the Protocol for input from interested parties in 2005 and finalized the Protocol in 2006. In September 2008, having completed the studies called for in the Protocol, the FAA published a three-volume, 900-page draft EIS. In relevant part, the draft set forth the procedures used to analyze the project's air quality impacts and the results of that analysis. It

also incorporated by reference a draft Air Quality Technical Report, which further detailed the methodologies and data underlying the FAA's analysis.

To assess the project's air quality impacts, the FAA conducted a detailed emissions analysis of two potential project alternatives ("build" alternatives "A" and "B") and a third alternative of not undertaking the project (the "no-build" alternative). In a table known as an emissions inventory, the FAA estimated the total project-related emissions of six air pollutants under the two build alternatives for each of the thirteen years of construction. The FAA calculated the future impact of the project on PHL's operational emissions by comparing predicted total emissions under the build and no-build alternatives in two post-construction years, 2025 and 2030.[2] To obtain a more detailed assessment of operational air quality impacts, the FAA conducted dispersion modeling, an analytical technique that converts an emissions inventory into estimates of outdoor concentrations of pollutants at particular locations.

In November 2008, the EPA submitted comments on the draft EIS citing alleged data omissions in the FAA's analysis. The FAA considered and responded to each of the EPA's comments in the final EIS, issued on August 20, 2010. Some of the FAA's responses described revisions to the air quality analysis it had adopted based on EPA comments.

---

[2] The Project has been delayed because of the longer-than-anticipated environmental review process. The FAA does not believe this delay affects its emissions estimates.

6

Others explained the FAA's decision to stand by its chosen analytical approach.

Appended to the final EIS was the FAA's General Conformity Determination, a formal determination under the Clean Air Act and related regulations that the project would not interfere with Pennsylvania's compliance with national air quality standards. In that document, the FAA summarized its findings: (1) operational emissions (i.e., Airport emissions after project completion) of volatile organic compounds (VOC), nitrogen oxides ($NO_x$), fine particulate matter of less than 2.5 micrograms ($PM_{2.5}$), and sulfur dioxide ($SO_2$) would be below the de minimis thresholds established by EPA regulations; (2) construction emissions of $PM_{2.5}$ and $SO_2$ would be below the de minimis levels; (3) construction emissions of $NO_x$ would exceed the de minimis thresholds in certain years, but the City of Philadelphia would be required to apply Airport Emission Reduction Credits to bring those emissions below the threshold;[3] and (4) VOC emissions would exceed de minimis levels during certain years of

---

[3] As required by a provision of the Vision 100—Century of Aviation Reauthorization Act, 49 U.S.C. § 47139, the EPA and FAA created the Voluntary Airport Low Emission Program, which awards Airport Emission Reduction Credits for the use of low-emissions vehicles and equipment. These credits can be used to offset other airport-related emissions to maintain compliance with national air quality standards. The City of Philadelphia participates in this program and earns sufficient credits to fully offset project-related $NO_x$ emissions.

7

construction, but the City would be required to fully offset those emissions by acquiring and applying Emission Reduction Credits.[4]

The publication of the final EIS concluded the NEPA process, but agency discussions on the air quality studies continued. On September 27, 2010, the EPA again submitted comments on the FAA's study design. After several weeks of dialogue, some differences of opinion remained. On December 30, 2010, the FAA published its Record of Decision, which approved the expansion project and delineated the FAA's reasons for approval. The Record of Decision included a finding that the project was "reasonably consistent with existing plans of public agencies for development of areas surrounding the airport," as required by the consistency provision of the Airport and Airway Improvement Act, 49 U.S.C. § 47106(a)(1).

## B.

PHL lies on the boundary between the City and County of Philadelphia on the east and Tinicum Township, Delaware County, on the west. The expansion project calls for the acquisition of land to the west of the Airport and will result in the displacement of a number of residences and businesses in Tinicum Township.

---

[4] Emissions Reduction Credits are off-airport reduction credits that the City will purchase through a state program.

Tinicum petitioned for review of the Record of Decision, which constituted final agency action subject to review under the Administrative Procedures Act (APA). *See* 49 U.S.C. § 46110. We review the FAA's action under the APA's arbitrary and capricious standard. 5 U.S.C. § 706(2)(A) (requiring that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). We confine our review to the administrative record upon which the FAA's Record of Decision was based. *See C.K. v. N.J. Dep't of Health & Human Servs.*, 92 F.3d 171, 182 (3d Cir. 1996) (citing *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).[5]

## II.

## A.

The FAA conducted the air quality analysis at issue to meet the overlapping requirements of NEPA and the Clean

---

[5] Respondents urge us to consider a letter the EPA submitted on April 26, 2011, four months after the FAA issued its Record of Decision. In that letter, the EPA clarified its final views on the EIS, dropping several of its objections to the air quality analysis conducted by the FAA. We will consider the April 26 letter for the limited purpose of evaluating Petitioners' argument that new information, obtained from two supplemental emissions studies and described in the letter, mandates a supplemental EIS.

9

Air Act. "NEPA is a procedural statute that does not mandate particular substantive results." *N.J. Dep't of Envtl. Prot. v. U.S. Nuclear Regulatory Comm'n*, 561 F.3d 132, 133 (3d Cir. 2009). NEPA's procedural requirements aim to ensure that an agency "consider[s] every significant aspect of the environmental impact of a proposed action" and "inform[s] the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* at 134 (quoting *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (internal quotation marks omitted)).

In reviewing the adequacy of an agency's Environmental Impact Statement under NEPA, "[w]e make a pragmatic judgment whether the [EIS's] form, content and preparation foster both informed decision-making and informed public participation." *Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 705 (3d Cir. 1999) (citation and quotation marks omitted). We ask whether the agency took a "hard look" at the potential environmental impacts of its action. *Id*. We do not, however, "substitute [our] judgment for that of the agency." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 389 (3d Cir. 2004) (quoting *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). NEPA entrusts agencies with the role of determining "whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004). In the air quality analysis on review, the FAA reasonably considered the "usefulness" of additional information on the project's air quality impacts in light of the national air quality policy priorities and standards

10

articulated in the Clean Air Act, 42 U.S.C. §§ 7401-7671q, and related regulations. In fact, Council on Environmental Quality (CEQ) regulations call on federal agencies to integrate the NEPA process with the Clean Air Act analysis. 40 C.F.R. § 1502.25(a) ("To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by . . . other environmental review laws . . . .").

The Clean Air Act establishes a joint federal and state program to limit air pollution by setting national ambient air quality standards (NAAQS). *See* 42 U.S.C. § 7409. The EPA sets the NAAQS for specified pollutants, including sulfur dioxide, carbon monoxide, ozone, lead, nitrogen dioxide, coarse particulate matter of less than ten micrometers in diameter ($PM_{10}$), and fine particulate matter of less than 2.5 micrometers in diameter ($PM_{2.5}$). Each state then must adopt and submit to EPA for approval a plan—called a State Implementation Plan (SIP)—to meet the national standards. 42 U.S.C. § 7410. Federal agencies, in turn, must ensure that their actions conform to the applicable SIP. 42 U.S.C. § 7506(c)(1). EPA regulations set forth specific requirements for this conformity determination. 40 C.F.R. §§ 93.150-93.160. Agency actions that will result in emissions below the de minimis levels set by EPA regulations do not require a formal conformity determination. *See* 40 C.F.R. § 93.153(b).

Because the EPA is charged with administering and implementing the Clean Air Act and has significant responsibilities under the National Environmental Policy Act,

11

Tinicum urges us to defer to its comments on the FAA's air quality analysis under *Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984). We extend *Chevron* deference to an agency action if Congress intended the action to "carry the force of law." *Swallows Holding, Ltd. v. Comm'r of Internal Revenue*, 515 F.3d 162, 169 (3d Cir. 2008). In urging deference here, Tinicum misapprehends the EPA's role in commenting on the FAA's Environmental Impact Statement. CEQ regulations require the lead agency, the FAA in this case, to "[o]btain the comments of any Federal agency" that has "jurisdiction" or "special expertise" or "is authorized to develop and enforce environmental standards," including the EPA here. 40 C.F.R. § 1503.1(a)(1). The EPA and other relevant agencies then review and comment on the EIS. 40 C.F.R. § 1503.2. Responding, the lead agency may: modify the alternative action it has reviewed; develop and evaluate new alternative actions; "supplement, improve, or modify its analyses[;]" "make factual corrections[;]" or "[e]xplain why the comments do not warrant further agency response . . . ." 40 C.F.R. § 1503.4(a). And if, in its review of an agency action, the EPA determines that it "is unsatisfactory from the standpoint of public health or welfare or environmental quality[,]" the Clean Air Act directs the EPA to refer the matter to the Council on Environmental Quality. 42 U.S.C. § 7609(b). Significantly, the EPA did not do so here.

Under this statutory and regulatory framework, the EPA's comments do not carry the force of law and do not warrant *Chevron*-style deference. *See Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 154-55 (3d Cir. 2004)

(noting that *Chevron* deference is inapplicable to agency interpretations rendered in "opinion letters, policy statements, agency manuals, and enforcement guidelines"). As the D.C. Circuit noted in similar circumstances, "[the FAA] does not have to follow the EPA's comments slavishly—it just has to take them seriously." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 201 (D.C. Cir. 1991). Accordingly, we review whether the FAA gave sufficient consideration to the EPA's comments.

B.

Citing the EPA's comments, Tinicum alleges five technical errors in the FAA's air quality analysis that purportedly render its environmental review inadequate under NEPA. Each allegation pertains to a category of data excluded from the FAA analysis. While additional data might enable a more detailed environmental analysis, NEPA does not require maximum detail. Rather, it requires agencies to make a series of line-drawing decisions based on the significance and usefulness of additional information. *Coalition on Sensible Transp. Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987). With this in mind, we review the FAA's air quality analysis, considering each of the alleged technical defects.

The FAA divided its analysis of the project's air quality impacts into two time periods: the construction period and the post-construction operational period. In its study of construction period emissions, the FAA compiled an emissions inventory that detailed, for each year of

13

construction, all project-related emissions of sulfur dioxide ($SO_2$), nitrogen oxides ($NO_x$), volatile organic compounds (VOCs), and fine particulate matter of less than 2.5 micrometers in diameter ($PM_{2.5}$). The inventory included anticipated emissions from construction vehicles and equipment, asphalt paving, fugitive dust, the vehicles of commuting construction workers, and additional aircraft emissions due to delays caused by construction. The FAA compared total project-related emissions against the de minimis emissions levels set by the EPA's conformity regulations under the Clean Air Act and found that during the construction period emissions of $SO_2$ and $PM_{2.5}$ would be below the de minimis thresholds set by EPA regulations. But the FAA also found that emissions of VOC would exceed the de minimis threshold in the fifth, sixth, and eighth years of construction and that emissions of $NO_x$ would exceed the threshold in the second, fifth, and sixth years. Accordingly, the Record of Decision calls on the City of Philadelphia to acquire and apply emissions credits to fully offset VOC and $NO_x$ emissions during those particular years.

Citing an EPA comment, Tinicum claims that NEPA required the FAA to go further and model the dispersion of these construction period emissions to show how they would affect local ambient concentrations of pollutants in the area. We disagree. As the FAA explained, aside from emissions of two pollutants over short periods of time, emissions levels during construction would fall below the de minimis thresholds defined by the EPA's conformity regulations. Those levels have been set to reflect "activities [that] by definition could not threaten a state's attainment of the goals

14

in its SIP." *Envtl. Def. Fund, Inc. v. EPA.*, 82 F.3d 451, 467 (D.C. Cir. 1996). Meanwhile, the emissions of two pollutants that would exceed de minimis thresholds for a short period of time would be fully offset by emissions credits for reductions in emissions at PHL and elsewhere. Moreover, the FAA's approach to construction emissions was consistent with the Air Quality Analysis Protocol agreed to by the FAA and the EPA. For these reasons, the FAA's decision to stop short of dispersion modeling for the construction period was not arbitrary or capricious.

We reach the same conclusion in our review of the FAA's analysis of operational emissions upon completion of the project. To evaluate post-project operational emissions, the FAA prepared an inventory of anticipated airport emissions for the years 2025 and 2030. Using the anticipated emissions under the no-build alternative as a point of comparison, the FAA found the expansion project would initially decrease operational emissions by significantly reducing the time that delayed aircraft spent waiting and taxiing on congested runways. Five years after project completion, emissions of certain pollutants would increase slightly relative to the no-build alternative as airlines made use of additional runway capacity. Significantly, the FAA determined that any increase in emissions would fall well below the de minimis thresholds. Although this finding was sufficient to satisfy the conformity regulations, the FAA decided to conduct dispersion modeling of the project's operational emissions to better analyze and disclose the project's ongoing impact on ambient concentrations of air pollutants.

15

The EPA commented that this modeling did not include nearby sources of $PM_{2.5}$[6] and suggested that this omission conflicts with EPA guidance on air quality modeling.[7] But the FAA had already demonstrated that the project's impact on operational emissions was de minimis, and no modeling at all was required under the conformity regulations. *See* 40 C.F.R. § 93.153. Further, in its response to the EPA, the FAA noted that the dispersion modeling it had conducted was intended to assess the project's impact on ambient concentrations near PHL. Because the project would not affect emissions from nearby sources, adding those sources to its dispersion model would not help assess that impact.

The EPA also questioned the FAA's decision not to model the effect of building downwash (i.e., the tendency of buildings to generate a downdraft that pulls pollutants toward the ground) on the dispersion of emissions from boilers. But as the FAA explained, boiler emissions were a trivial contributor to total project emissions. Furthermore, at this stage of project planning, the size and location of boilers and buildings had yet to be determined. After those aspects of the

[6] Fine particulate matter emissions are of concern because the area surrounding the Airport is designated a nonattainment area for $PM_{2.5}$, meaning ambient levels of $PM_{2.5}$ already exceed the National Ambient Air Quality Standards.

[7] The EPA found this omission problematic because the Airport was situated near sources of substantial particulate matter emissions, including a coal fired power plant and at least four oil refineries within five kilometers.

project are established, a more accurate assessment of building downwash may be conducted as part of the Pennsylvania Department of Environmental Protection permitting process. For these reasons, the FAA's omission of the building downwash effect was not arbitrary or capricious.

Turning to the project's impacts on traffic volume and automobile emissions, Tinicum cites another EPA comment to contest the size of the study area. Consistent with the Air Quality Analysis Protocol, the FAA defined the boundaries of its regional study area to include a section of I-95 near PHL and the roadway system immediately surrounding the Airport. In its comments, the EPA cautioned that the expansion project would cause traffic volume to increase beyond the FAA's designated study area. But as the FAA noted in response, the broader regional effects on traffic volumes would be considered as part of the regional travel demand analysis prepared by the Delaware Valley Regional Planning Commission. Fittingly, the conformity regulations contemplate this regional approach. 40 C.F.R. § 93.158 (conformity regulations are satisfied for portions of a project that are included in a valid transportation improvement plan). Accordingly, the FAA's decision to forgo a broader regional examination of the project's impact on automobile emissions in the EIS was neither arbitrary nor capricious.

Finally, Tinicum cites another EPA comment to argue that the FAA exaggerated the emissions under the no-build alternative by adopting the assumption that airlines would "upgauge" (i.e., use larger aircraft) if the airport did not expand. Because the EIS assessed project emissions relative

17

to the no-build alternative, Tinicum argues that this assumption understates the project's emissions impact. This argument lacks merit. The FAA anticipated increased passenger demand at PHL whether or not the expansion project proceeded, and we accord deference to the FAA's demand forecasts. *See St. John's United Church of Christ v. FAA*, 550 F.3d 1168, 1172 (D.C. Cir. 2008). Given increasing passenger demand and no increase in runway capacity under the no-build alternative, airlines would appear to have little choice but to fly larger planes. The FAA's Air Quality Technical Report explains this aspect of its analysis in detail, documenting the mix of aircraft that the FAA anticipated under the no-build alternative and the FAA's preferred-build alternative. The FAA's "upgauging" assumption was both reasonable and adequately disclosed.

In sum, the FAA gave serious consideration and reasonable responses to each of the EPA's concerns.[8] As the lead agency, the FAA has some latitude to determine the level of analytical detail necessary to support an informed decision

---

[8] As Tinicum points out, CEQ regulations call on the lead agency to "[u]se the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency." 40 C.F.R. § 1501.6(a)(2). This regulation was intended "to emphasize agency cooperation early in the NEPA process." 40 C.F.R. § 1501.6. The FAA fulfilled its responsibility as lead agency by seeking the EPA's input and by offering considered responses to the EPA's comments.

and to adequately disclose air quality impacts to the public. The technical errors alleged by Tinicum do not render the FAA's air quality analysis arbitrary or capricious.

C.

Even if the EIS was adequate when issued, Tinicum demands a supplemental EIS based on two post-decision air quality studies referenced in a letter the EPA submitted to the FAA on April 26, 2011, four months after the Record of Decision was issued. Council on Environmental Quality regulations require a supplemental EIS if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns" or if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R § 1502.9(c)(1). We review an agency's decision not to supplement an EIS under the arbitrary and capricious standard. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375-76 (1989).

The two post-decision studies do not require a supplemental EIS. As the EPA noted in its April 26 letter, these two studies confirmed the conclusions the FAA reached in its Record of Decision and did not indicate any significant environmental impacts not contemplated in the EIS. Where new information merely confirms the agency's original analysis, no supplemental EIS is indicated. *See Town of Winthrop v. FAA*, 535 F.3d 1, 10 (1st Cir. 2008) (citing *Vill. of Bensenville v. FAA*, 457 F.3d 52, 71 (D.C. Cir. 2006)).

19

III.

Tinicum contends the FAA failed to comply with the consistency requirement of the Airport and Airway Improvement Act (AAIA), which provides that the FAA may only approve an airport project if it is "consistent with plans (existing at the time the project is approved) of public agencies authorized by the State in which the airport is located to plan for the development of the area surrounding the airport." 49 U.S.C. § 47106(a)(1). Citing plans of the Delaware Valley Regional Planning Commission (DVRPC), the state-authorized metropolitan planning organization and comprehensive land use planning agency for the Delaware Valley region, the FAA found the PHL expansion project "reasonably consistent" with public agency development plans for the area. We review the FAA's compliance with the AAIA under the arbitrary and capricious standard. *See Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689-90 (D.C. Cir. 2004). Tinicum challenges this finding on two grounds: first, that the FAA applied too lenient a standard in finding the project "reasonably consistent" with local development plans, since the statutory language requires that the project be "consistent" with such plans; and second, that the relevant public agencies for this consistency determination are Tinicum Township and Delaware County, not the DVRPC. We reject both contentions.

A 1964 amendment to the Federal Airport Act required an airport project to be "reasonably consistent" with agency development plans for the surrounding area. Pub. L. No. 88-280, § 8(e), 78 Stat. 158, 161 (1964). In 1994, Congress

20

recodified certain transportation laws, including the consistency provision. Pub. L. No. 103-272, 108 Stat. 745 (1994). The recodified provision omitted the word "reasonably." But the law's text expressly dispels Tinicum's contention that this changed the provision's meaning. Pub. L. No. 103-272, § 6(a), 108 Stat. at 1378 (1994) ("Sections 1-4 of this Act restate, without substantive change, laws enacted before July 1, 1993, that were replaced by those sections. Those sections may not be construed as making a substantive change in the laws replaced."). Furthermore, the legislative history recites that the word "reasonably" was "omitted as surplus." H.R. Rep. No. 103-180, at 398 (1993). Accordingly, this change was semantic, not substantive. The FAA's use of a reasonable consistency standard does not render its determination arbitrary, capricious, or otherwise not in accordance with law.

Nor did the FAA err in basing its consistency determination on the plans of the DVRPC. The DVRPC was created in 1965 by the Delaware Valley Urban Area Compact. *See* 73 P.S. § 701; N.J. Rev. Stat. §§ 32:27-1, *et seq*. The Compact designates the DVRPC as an "instrumentality of the Commonwealth of Pennsylvania and the State of New Jersey exercising a government function." Art. VI, § 1. As such, the DVRPC qualifies as a public agency under the Airport and Airway Improvement Act. *See* 49 U.S.C. § 47102(20) (defining "public agency" to mean, *inter alia*, "a State or political subdivision of a State" or a "tax-supported organization"). The DVRPC's plans are particularly relevant to the FAA's consistency determination because of its role in conducting transportation planning for

the region surrounding PHL. In the Compact, Pennsylvania and New Jersey granted the DVRPC authority "to organize and conduct a continuing, comprehensive, coordinated regional planning program for the area, including but not limited to transportation planning for the interests and purposes . . . of the agencies of Pennsylvania and New Jersey . . . as well as for the purposes of the local governments and their planning agencies." Art. I, § 3. The FAA reasonably looked to the DVRPC's plans in making its consistency determination. Accordingly, that determination was neither arbitrary nor capricious.

## IV.

For the foregoing reasons, we will deny the petition for review.