**NOT RECOMMENDED FOR PUBLICATION**
File Name: 14a0608n.06

**No. 13-6214**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| COALITION FOR THE ADVANCEMENT OF REGIONAL TRANSPORTATION, | ) ) ) | |
| Plaintiff-Appellant, | ) ) ) | **FILED**<br>Aug 07, 2014<br>DEBORAH S. HUNT, Clerk |
| v. | ) ) | |
| FEDERAL HIGHWAY ADMINISTRATION; VICTOR M. MENDEZ, In his Official Capacity as Administrator of the Federal Highway Administration; JOSE SEPULVEDA, In his Official Capacity as Division Administrator, Kentucky Division, Federal Highway Administration; KAREN BOBO, in her Official Capacity as Acting Indiana Division Administrator, Federal Highway Administration, | ) ) ) ) ) ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| Defendants-Appellees, | ) ) | |
| and | ) ) | |
| INDIANA DEPARTMENT OF TRANSPORTATION; MICHAEL CLINE, In His Official Capacity as Commissioner, Indiana Department of Transportation; KENTUCKY TRANSPORTATION CABINET; MICHAEL W. HANCOCK, In His Official Capacity as Secretary, Kentucky Transportation Cabinet; KENTUCKIANS FOR PROGRESS, INC., | ) ) ) ) ) ) ) ) ) | |
| Intervening Defendants-Appellees. | ) | |

BEFORE: GRIFFIN and DONALD, Circuit Judges; and GRAHAM, District Judge.*

GRIFFIN, Circuit Judge.

Plaintiff Coalition for the Advancement of Regional Transportation alleges that defendants failed to comply with the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*, and violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d), when they approved the Louisville-Southern Indiana Ohio River Bridges Project, a $2.6 billion construction and transportation management program designed to improve mobility across the Ohio River in the Louisville metropolitan area. The district court granted summary judgment in favor of defendants on all claims. We affirm.

I.

Plaintiff is a volunteer member, tax exempt 501(c)(3) organization, incorporated in 1993 in Louisville, Kentucky, for the purpose of promoting sustainable and equitable, regional, modern transit planning. There are two categories of defendants in this case: the federal defendants and the state defendants. The federal defendants include the Federal Highway Administration ("FHA"); Victor Mendez, Administrator of the FHA; Karen Bobo, Indiana Division Administrator of the FHA; and Jose Sepulveda, Kentucky Division Administrator of the FHA. The state defendants include Kentucky; Michael W. Hancock, Secretary of the Kentucky Transportation Cabinet; Indiana; and Michael B. Cline, Commissioner of the Indiana Department of Transportation.

---

*The Honorable James L. Graham, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

The saga of the Louisville-Southern Indiana Ohio River Bridges Project (the "Project") spans over twenty years and includes an Administrative Record in excess of 150,000 pages. The relevant background set forth by the district court is reproduced below:

> Currently, three bridges provide transit across the Ohio River between Jefferson County in Kentucky and Clark County in Southern Indiana. Beginning with the western-most bridge, the Sherman Minton Bridge carries I-64 traffic between West Louisville and New Albany, Indiana. About four miles to the east is the downtown George Rogers Clark Memorial Bridge, which carries U.S. 31 traffic across the Ohio River. Finally, less than half a mile to the east of the Clark Memorial Bridge lies the John F. Kennedy Memorial Bridge ("Kennedy Bridge"), which carries I-65 traffic between downtown Louisville and Jeffersonville, Indiana.
>
> Over the course of a decade, Defendants investigated cross-river traffic issues and the possibility of alleviating problems by building a fourth bridge in East Louisville and reconstructing the existing transportation infrastructure. This culminated in the Project, which is a roughly $2.6 billion construction and transportation management program designed to improve mobility across the Ohio River between Louisville and Southern Indiana. The Project addresses current cross-river traffic congestion and safety needs, provides better navigability within the existing transportation system, and improves cross-river mobility, especially in light of existing and anticipated population and employment patterns in the region. In its current iteration, the Project includes the following five major elements:
>
> - Downtown Crossing: Defendants will reconstruct, expand, and reconfigure the Kennedy Bridge. The existing but reconstructed Kennedy Bridge will carry six lanes of southbound I-65 traffic. Defendants will construct a new bridge parallel to and immediately upstream of the Kennedy Bridge, and this new span will carry six lanes of northbound I-65 traffic. Defendants will also reconstruct the downtown Louisville I-65/I-64/I-71 Kennedy Interchange ("Kennedy Interchange") and approach roadways in Jeffersonville, Indiana.
>
> - East End Crossing: Defendants will construct a new bridge connecting KY 841 (Gene Snyder Freeway) in eastern Jefferson County, Kentucky, with S.R. 265 (Lee Hamilton Highway) in eastern Clark County, Indiana. The East End Crossing will not be part of the Interstate system.

- Tolling: Defendants will place electronic tolling facilities on the expanded and reconstructed Downtown Crossing (both directions) and the new East End Crossing to assist in financing the Project.

- Transportation Management: Defendants will provide enhanced funding for bus service.

- Mitigation Commitments: Defendants will plan and implement various mitigation strategies aimed at ameliorating potential impacts on the natural and human environment resulting from the Project's implementation.

Since the Project's conception, Defendants have undergone various phases of planning and implementation. [ ] From 1991 to 1994, Kentucky and Indiana sponsored the Metropolitan Louisville Ohio River Bridge Study, which examined four potential cross-river bridge locations. The study recommended further evaluation of two bridge locations in the "Near East" (near the terminus of I-264) and in the "Far East" (near the termini of KY 841 and S.R. 265). In 1995, based on that preliminary study, the Kentuckiana Regional Planning and Development Agency initiated the Ohio River Major Investment Study ("ORMIS"). That study evaluated a wide range of potential transportation schemes to improve cross-river mobility. Ultimately, ORMIS recommended a two-bridge solution, which entailed the construction of a downtown bridge adjacent to the Kennedy Bridge, reconstruction of the Kennedy Interchange, and construction of a bridge in the Far East.

To pursue this recommendation, the States sought federal assistance. To receive federal funding for transportation projects, the FHA must verify that applicants comply with the National Environmental Protection Act ("NEPA"). NEPA prescribes a process that federal agencies must follow before taking any action that significantly affects the environment. [ ]

The FHA initiates the NEPA process by publishing a Notice of Intent to prepare an environmental impact statement ("EIS"). 40 C.F.R. § 1508.22. Following the issuance of the Notice of Intent, the agency prepares a Draft EIS. 40 C.F.R. § 1502.9. The EIS must provide a "full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. Alternative actions, including a No Action Alternative required to be considered by 40 C.F.R. § 1502.13(d), are measured against the Purpose and Need Statement, which explains why the agency is proposing to spend federal money on an action that potentially results in significant environmental impacts. 40 C.F.R. § 1502.13 ("The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.").

Once the agency publishes the Draft EIS, the public may submit comments in response. Next, the agency must issue a Final EIS, which accounts for public comments, addresses opposing views not already discussed in the Draft EIS, and incorporates any further information necessary to justify implementation of the proposed project. 40 C.F.R. § 1502.9. Finally, the FHA will issue a Record of Decision ("ROD") approving the final proposed action prior to its implementation. Occasionally, the FHA must prepare a supplemental EIS to respond to "substantial changes in the proposed action that are relevant to environmental concerns" or "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* If the agency issues a supplemental EIS after the ROD, the agency must prepare a revised ROD. 23 C.F.R. § 771.127(b).

On March 27, 1998, the FHA published the Notice of Intent to prepare an EIS based on the ORMIS recommendation. Next, in preparing the Draft EIS, Defendants evaluated the region's transportations issues to compose the Project's Purpose and Need Statement. [ ] Defendants then identified and analyzed a range of alternatives that could possibly meet the Project's objectives.

The FHA published the Draft EIS in November 2001, and a 101-day public comment period followed. The FHA then published the Final EIS in September 2003, reflecting consideration of public input, potential environmental impacts, and possible adaptions to reduce residual problems.

The Final EIS initially screened a variety of alternatives that can be categorized into five major groups:

- Transportation System Management Alternatives (*e.g.*, traffic signal timing and coordination and HOV lanes);

- Transportation Demand Management Alternatives (*e.g.*, carpooling and congestion pricing);

- Mass Transit Alternatives (e.g., rail transit and enhanced bus service);

- Bridge/Highway Alternatives (including five potential cross-river bridge and highway combinations, Kennedy Interchange reconstruction, and a river tunnel alternative); and

- No Action Alternative

Following the initial screening, Defendants advanced three groups of alternatives that most closely met the tenets of the Purpose and Need Statement: the

Transportation Demand Management Alternatives, the Bridge/Highway Alternatives in three locations (Far East, Near East, and Downtown), and the legally required No Action Alternative.

In its secondary analysis, Defendants further evaluated Bridge/Highway Alternatives as to the three proposed bridge locations. Defendants engaged in an investigation of nine potential highway and bridge alignments, each of which included either a One Bridge/Highway or a Two Bridges/Highway Alternative. The inquiry analyzed traffic congestion and traffic safety problems on the existing Ohio River bridges and within the Kennedy Interchange. The FHA considered then-current economic conditions and growth projections based on historical trends and local land use plans. Using this information, the Final EIS identified specific performance measures to evaluate the alternatives and their potential to meet the Purpose and Need Statement.

The Final EIS then advanced four primary alternatives for the Project: the No Action Alternative, the Transportation Management Alternatives, One Bridge/Highway Alternatives, and Two Bridges/Highway Alternatives. Ultimately, Defendants concluded that a Two Bridges/Highway Alternative, called the Selected Alternative, would best meet the Purpose and Need Statement because this option would provide a feasible and prudent long-term solution to the region's cross-river mobility needs.

In September 2003, the FHA issued the ROD, which ratified the Selected Alternative. That scheme entails construction of the East End and Downtown Crossings, and incorporates various transportation management strategies, including enhanced bus service. At that time, Defendants estimated that the Project would cost $4.068 billion.

Having chosen the Selected Alternative, Defendants next focused on funding the Project. In October of 2007, the States submitted the Project's Initial Financial Plan ("IFP") to the FHA, which proposed to entirely fund the Project with traditional federal and state revenue sources. However, by 2009, the relevant parties discovered that only $1.9 billion would be available from traditional sources, leaving a funding shortfall of $2.2 billion.

In response, the Kentucky General Assembly enacted legislation establishing the Louisville and Southern Indiana Bridges Authority (the "Bridges Authority") empowered to create and oversee financial planning for the Project. The Bridges Authority, working with the States, explored various alternative funding methods. In 2010, it submitted an updated IFP, listing tolls as a potential funding option. The Bridges Authority projected revenue from tolling to generate between $800 million and $1.2 billion in additional funding, which when combined with traditional funding sources, would satisfy the Project's funding requirements. In

early 2011, the States presented design modifications believed to be capable of reducing the total cost of the Project by $1.2 billion.

As a result of comprehensive changes to the design and funding of the Project and public concern over potential tolling, the FHA and the States decided to prepare a Supplemental EIS for public review and comment. The Supplemental EIS included updated transportation forecasts and demographic data based on a new "time of day" model that forecasts traffic and congestion at key times of the day. The new modeling indicated that while some traffic volumes and congestion rates had changed, the basic needs for the Project were still valid. The Supplemental EIS formulation process resulted in the public circulation of an Alternatives Evaluation Report, which re-assessed the alternatives analyzed in the Final EIS in light of the updated data. The report considered the implementation of One Bridge/Highway Alternatives without tolls. Importantly, that evaluation confirmed that One Bridge/Highway Alternatives failed to address the full range of cross-river mobility needs identified in the reaffirmed Purpose and Need Statement. Consequently, Defendants did not conduct an in-depth financial feasibility analysis of those alternatives.

Ultimately, Defendants affirmed the Selected Alternative as the preferred option. However, Defendants acknowledged that non-tolled alternatives alone would be insufficient to fund the Project. Therefore, Defendants recommended a new alternative, the Modified Selected Alternative, which incorporated financing from both traditional sources and toll-based revenues, the States' proposed cost-saving design changes, and the originally selected bridge locations.

In November 2011, the FHA issued the Supplemental Draft EIS for public comment. On April 20, 2012, the FHA published the Supplemental Final EIS, which evaluated the No Action Alternative, the Final EIS Selected Alternative, and the Modified Selected Alternative based on updated socioeconomic and environmental data. It identified the Modified Selected Alternative as the best scheme to meet the Project's purpose and need. Finally, on June 20, 2012, the FHA issued the Revised ROD confirming the Modified Selected Alternative as the preferred option.

Turning to the substance of the Supplemental Final EIS, NEPA requires an EIS to evaluate the Project's environmental consequences. 40 C.F.R. § 1502.10. The Supplemental Final EIS includes a chapter entitled, "Environmental Consequences", which discusses the potential environmental impacts of each alternative, including impacts on socioeconomics, water quality, wetlands, air quality, wildlife, endangered species, land use, historic resources, noise, and aesthetics. 40 C.F.R. § 1502.16. The FHA consulted federal and state agencies in preparing this chapter. Specific to the Project's anticipated locale, the Supplemental Final EIS summarizes the existing water quality in the area, including Harrods Creek and the Wellhead Protection Area. It also considered the

adverse impacts to water quality resulting from the Project, most notably analyzing the effects of potential sources of pollution such as de-icing compounds; herbicides and pesticides; oil, grease, and various heavy metals from vehicles; and spillage of toxic chemicals. The analysis concluded that the amount of vehicular pollutants from roadway runoff will be small and cause no material adverse impacts.

Next, the Supplemental Final EIS evaluates potential air quality impacts, describing existing air quality conditions in the Louisville Metropolitan area and the region's compliance with the National Ambient Air Quality Standards for certain pollutants. The Supplemental Final EIS recognizes potential emissions of greenhouse gases, but acknowledges the inherent limitations in evaluating Project-specific greenhouse gas emissions due to the global nature of these emissions. In the end, it concludes that the emissions likely to result from the Project will conform to the applicable air quality standards.

In the Supplemental Final EIS, Defendants also evaluated the Project's potential impact on low income and minority populations. Defendants' analysis relies on 2010 demographic data to identify the affected "environmental justice" populations. It contains a summary of current cross-river travel as illustrated in the Ohio River Bridges User Study, including use of the existing Ohio River bridges by minority and low income individuals. Further, the Supplemental Final EIS evaluates the economic impacts of tolling by analyzing the average cost per trip for travel originating in all Louisville communities.

The Supplemental Final EIS concludes that tolling and other effects of the Project do not disproportionately impact any specific population to a material degree, because all cross-river travelers collectively bear the burden of tolls and the Project would not displace any residents within specific communities. However, the FHA concedes that based on average cost per trip data, the Project is likely to cause a disproportionately high and adverse effect on some low income and minority populations, because the user cost would represent a greater comparative economic burden.

Defendants have considered strategies for mitigating the possible economic effects of tolling on minority populations, including a commitment to develop a tolling policy that is sensitive and responsive to low income and minority populations. For instance, in the final tolling policy, the States have already committed $20 million to the local bus transit system for enhanced bus service, which will abate some of the effect of tolling on minority populations.

In July of 2012, Defendants, in conjunction with the Indiana Finance Authority and the Kentucky Public Transportation Infrastructure Authority, entered into an agreement (the "Toll Agreement") authorizing the Downtown and East End Crossings as tolled facilities. The Toll Agreement asserts that the Project

complies with the [Federal-Aid Highway Act ("FAHA")], which permits federal participation in the construction of a new toll bridge that is not part of the Interstate System (here, the East End Crossing) and the reconstruction of an existing non-tolled Interstate bridge converted to a tolled facility (allegedly, the Downtown Crossing).

Ten days later, the FHA approved an update to the 2010 IFP. The 2012 IFP includes detailed estimates of the cost to complete the Project with a summary of costs incurred to date, presents key cost-related assumptions, and breaks down costs by year, state, and type of expenditure. Based on an estimated $2.6 billion cost, the update reflects a financing strategy utilizing conventional state and federal transportation funds and toll-based revenues. It evaluates potential financing risk factors, such as the availability of traditional transportation funds, sufficiency of toll revenues, and access to capital markets for toll revenue bonds. Further, it provides mitigation strategies to manage the risk and discusses the anticipated impacts of the Project on each State's transportation programs, budgets, and other projects. The IFP will be updated each year.

(Footnotes omitted.)

Plaintiff filed twenty claims against defendants, alleging that the Project violates NEPA, certain FAHA funding regulations, the Clean Water Act ("CWA"), the Clean Air Act ("CAA"), and discriminates against racial minorities in violation of Title VI. The federal defendants filed a Rule 12(c) motion for judgment on pleadings on plaintiff's CWA, CAA, and Title VI claims, and a Rule 56 motion for summary judgment on all remaining claims. The state defendants separately filed Rule 56 motions for summary judgment on all claims. Additionally, plaintiff filed a Rule 56 motion for summary judgment on its NEPA claims and a "motion for trial de novo" on its Title VI claims. The district court granted defendants' motions and denied plaintiff's motions as moot. Plaintiff timely appealed.

II.

We begin by noting that plaintiff has narrowed its claims on appeal. Plaintiff has expressly abandoned all CWA and CAA claims and conceded below that it has no Title VI claims against the federal defendants. Also, plaintiff does not appeal the district court's rejection

of its FAHA claims. Thus, we only address the NEPA claims and remaining Title VI claims against the state defendants. We now turn to the NEPA claims.

## III.

## A.

Plaintiff challenges under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.*, the FHA's approval of the Supplemental Final EIS and the Revised ROD, which resulted in a decision to provide federal funding to the Project. "When reviewing an administrative agency's final decision under the APA, we review the district court's summary judgment decision de novo, while applying the appropriate standard of review to the agency's decision." *Battle Creek Health System v. Leavitt*, 498 F.3d 401, 408 (6th Cir. 2007) (internal quotation marks and citation omitted). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Burley v. Gagacki*, 729 F.3d 610, 618 (6th Cir. 2013). And, the appropriate standard of review for the agency action challenged in this case is that we will set aside the FHA's approval only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[.]" 5 U.S.C. § 706(2)(A).

The arbitrary and capricious standard is the "least demanding review of an administrative action," and "requires the party challenging the agency's action to 'show that the action had no rational basis or that it involved a clear and prejudicial violation of applicable statutes or regulations.'" *Coalition For Gov't Procurement v. Federal Prison Indus., Inc.*, 365 F.3d 435, 475 (6th Cir. 2004) (*quoting McDonald Welding v. Webb*, 829 F.2d 593, 595 (6th Cir. 1987)). In considering whether agency action is "arbitrary and capricious," we may consider whether

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: [w]e may not supply a reasoned basis for the agency's action that the agency itself has not given.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1982) (internal quotation marks and citation omitted). "Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004) (internal quotation marks and citation omitted).

As we recently stated, "[j]udicial review of NEPA compliance is limited in scope." *Kentuckians for the Commonwealth v. U.S. Army Corps of Engineers*, 746 F.3d 698, 706 (6th Cir. 2014) (internal quotation marks and citation omitted). "Because NEPA is a procedural and not a results-driven statute, even agency action with adverse environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs." *Id.* (internal quotation marks and citation omitted). Thus, our review "ensures that the agency has adequately considered and disclosed the environmental impacts of its actions and that its decision is not arbitrary or capricious." *Id.* (internal brackets, quotation marks, and citation omitted).

B.

Before considering the merits of plaintiff's NEPA claims, we must address an evidentiary issue. Below, plaintiff offered evidence in support of its NEPA claims that was not in the Administrative Record. The district court refused to consider this new evidence because plaintiff had not shown that defendants had acted in bad faith during the NEPA process, which if shown,

might have warranted supplementation. The parties now dispute whether the court abused its discretion in refusing to consider plaintiff's new evidence.

We review a district court's refusal to supplement the administrative record for an abuse of discretion. *Sierra Club v. Slater*, 120 F.3d 623, 639 (6th Cir. 1997). "An abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Harlamert v. World Finer Foods, Inc.*, 489 F.3d 767, 773 (6th Cir. 2007) (internal quotation marks and citation omitted).

In considering challenges to agency action under the APA, the "'focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson Cnty.*, 286 F.3d 382, 387 (6th Cir. 2002) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). However, "[s]everal reasons justify supplementation of the administrative record, such as when an agency deliberately or negligently excludes certain documents, or when the court needs certain background information in order to determine whether the agency considered all of the relevant factors." *Slater*, 120 F.3d at 638 (internal quotation marks and citation omitted). To justify supplementation, courts have suggested that a plaintiff must make "a strong showing of bad faith." *Id.* (internal quotation marks and citation omitted).

The district court did not abuse its discretion in refusing to consider plaintiff's new evidence. First, plaintiff provides no explanation for why this late-discovered material could not have been submitted for consideration during the NEPA process, which lasted about fourteen years. Second, plaintiff had an opportunity to review the draft Administrative Record before it was finalized and did not identify any information that was missing at that time. Third, the district court properly rejected plaintiff's numerous examples of "bad faith" because the evidence

offered could not support a finding that defendants engaged in misconduct during the NEPA process. *See Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 175 (2004) ("Allegations of government misconduct are easy to allege and hard to disprove, so courts must insist on a meaningful evidentiary showing.") (internal quotation marks and citation omitted). Accordingly, the district court did not abuse its discretion by refusing to supplement the Administrative Record. We now turn to the merits.

C.

The parties first dispute whether the scope of the Project's Purpose and Need Statement found in the Supplemental Final EIS was arbitrary and capricious. Under NEPA regulations, each environmental impact statement "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. "Agencies enjoy considerable discretion in defining the purposes and needs for their proposed actions, provided that they are reasonable." *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012). However, they cannot define a project's purpose and need so narrowly that it contravenes NEPA's mandate to evaluate reasonable alternatives. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). Agencies should consider the factors relevant to the action's objective, including "the needs and goals of the parties involved" and the "views of Congress" as far as the agency can determine them and define a purpose and need "somewhere within the range of reasonable choices." *Id.* "Typically, a purpose is unreasonable when the agency defines it so narrowly as to allow only one alternative from among the environmentally benign ones in the agency's power, such that the [environmental impact statement] becomes essentially a foreordained formality." *Webster*, 685 F.3d at 422 (internal quotation marks and citation omitted).

The Purpose and Need Statement at issue in this case is not arbitrary and capricious. The defined purpose—"to improve cross-river mobility between Jefferson County, Kentucky, and Clark County, Indiana"—was based on five distinct needs: (1) "Inefficient mobility for existing and planned growth in population and employment in the downtown area and in eastern Jefferson and southeastern Clark Counties"; (2) "Traffic congestion on the Kennedy Bridge and within the Kennedy Interchange"; (3) "Traffic safety problems within the Kennedy Interchange and on the Kennedy Bridge and its approach roadways"; (4) "Inadequate cross-river transportation system linkage and freeway rerouting opportunities in the eastern portion of the Louisville Metropolitan Area (LMA)"; and (5) "Locally adopted transportation plans that call for two new bridges across the Ohio River and the reconstruction of the Kennedy Interchange." The Purpose and Need Statement is reasonable because it is supported by detailed study of existing traffic, safety, and other cross-river mobility problems, and described the use of extensive socio-economic data and state-of-the-art modeling of future travel conditions to project future transportation needs of the region. Moreover, because defendants justifiably found the various cross-river mobility needs between Jefferson County and Clark County to be intertwined, they reasonably defined the Purpose and Need Statement for the Project to be regional in scope.

Plaintiff's arguments do not establish that the Purpose and Need Statement resulted from an arbitrary and capricious decision-making process. First, plaintiff argues that the Purpose and Need Statement improperly combined a two-site project (the Kennedy Bridge and East End Bridge) into one "mega project." No law or regulation prohibited defendants from crafting an ambitious purpose and need statement designed to address regional, cross-river mobility concerns, and defendants rationally explained their decision to create a "mega project" as follows:

> Consideration of potential solutions to all of the cross-river mobility needs in one EIS is consistent with the requirements of NEPA. Potential solutions to a portion of those needs may affect solutions to other, related needs. In addition, the potential solutions may have similar or cumulative environmental effects that should be analyzed together in one EIS to allow an informed decision on any ultimate solution(s). Because these needs are interrelated, and have arisen at the same time and in the same geographic area, evaluation of the full range of potential solutions, or combinations of solutions, in one EIS achieves the intent of NEPA. That evaluation properly included various one- and two-bridge combinations, as well as the no action alternative.

This analysis comports with 40 C.F.R. § 1508.25(a)(2), which states that "[c]umulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the *same* impact statement." (emphasis added). The analysis also complies with 40 C.F.R. § 1508.25(a)(3), which provides that agencies may analyze "[s]imilar actions" in the "*same* impact statement" if those actions "have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." (Emphasis added.) Further, the decision to combine a two-site project into one regional "mega project" "requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies. Absent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately." *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) (internal citation omitted). On this record, plaintiff has not shown that defendants crafted the Purpose and Need Statement without a rational basis.

Second, plaintiff argues that the Purpose and Need Statement is arbitrary and capricious because it does not explicitly include aiding the minority population in West Louisville as a purpose or need. No law or regulation required defendants to include a goal of benefiting minority populations in the Purpose and Need Statement, and NEPA "does not substantively constrain an agency's choice of objectives[.]" *City of Alexandria, Va. v. Slater*, 198 F.3d 862,

-15-

867 (D.C. Cir. 1999). Plaintiff's policy disagreement regarding the scope of the Project as it relates to socio-economic conditions of the minority population in the region provides no basis for this court to conclude that the Purpose and Need Statement is arbitrary and capricious. Moreover, the Final EIS and the Supplemental Final EIS considered and analyzed the impact of the Project—and its alternatives—on low income and minority populations, including those in West Louisville, and found the Project would not have negative impacts on those populations.

Finally, plaintiff argues that the Purpose and Need Statement is arbitrary and capricious because defendants allegedly engaged in a "sham process" when it circulated the Purpose and Need Statement from the Final EIS for additional public comment during the Supplemental Draft EIS process. Specifically, plaintiff claims that defendants "pre-committed" to the Purpose and Need Statement in the Final EIS *before* the public comment even began on the Supplemental Draft EIS. Plaintiff bases its claim on an internal memorandum obtained from the state defendants, dated before the public comment period opened, which stated that:

> All of the elements of the original P&N remain valid, so there is no reason to change the P&N. Due to the passage of time, there may be a need to refresh the traffic data and other factual information in the P&N chapter. This can be done without changing the P&N - i.e., the elements would remain the same, but the supporting data would be more current.

Plaintiff also bases its claim on "secret meetings"—admittedly not included in the record—held nearly one year before the public comment period opened, in which defendant Hancock agreed to purchase real estate in the Project's proposed construction path from a private seller.

Plaintiff's evidence does not show that defendants "pre-committed" to the Purpose and Need Statement in the Final EIS or that the public comment period was a "sham process." The statement in the internal memorandum, drafted by the state defendants in preparation for the public comment period, was made in the context of an *already approved* highway project but

was opened to new public comment simply because the funding structure had changed and certain cost-savings methods were implemented that would change the Project's total cost. Moreover, the justifications to revalidate the original Purpose and Need Statement were set forth in a comprehensive white paper on the issue, and the Purpose and Need Statement in the Supplement Final EIS was updated with new information. Plaintiff's citation to the internal memorandum falls far short of demonstrating that the public comment period on the Supplemental Draft EIS was a "sham process." The same can be said for plaintiff's claims of "pre-commitment" through Hancok's real estate transaction: these allegations are vague, conclusory, and have absolutely no support in the record.

In sum, there is no basis in the record for this court to conclude that the scope of the Purpose and Need Statement was arbitrary and capricious.

D.

Next, the parties dispute whether defendants' review of "reasonable alternatives" to the Project was arbitrary and capricious. NEPA requires agencies to evaluate reasonable alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(iii); *see also* 40 C.F.R. § 1502.14(a) (agencies shall "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated"). "As a general matter, the range of alternatives that must be discussed under [NEPA] is a matter within an agency's discretion." *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 342 (6th Cir. 2006) (internal quotation marks and citations omitted). The reviewing court only determines whether the agency's range of alternatives is outside the "rule of reason," based on the needs the proposed action is designed to address. *Id.* at 346.

Here, through two lengthy NEPA reviews, consisting of over 140 pages of analysis, defendants evaluated a wide range of alternatives to satisfy the Project's Purpose and Need Statement. These alternatives included transit options; reconstruction of existing infrastructure; new crossings of various alignments; and traffic management programs—both individually and in combination. That evaluation led to the rational selection of the Modified Selected Alternative as the best option to solve the region's cross-river mobility needs.

Plaintiff's arguments do not show that defendants' review of the "reasonable alternatives" to the Project was arbitrary and capricious. Plaintiff primarily argues that reasonable non-tolled alternatives were improperly excluded and that the "mega project" Purpose and Need Statement was used to eliminate (1) a light-rail line and an East End Bridge "as stand-alone options" and (2) a "two-site combination" consisting of a light-rail line and an East End Bridge. The record undermines plaintiff's contentions.

Although plaintiff claims defendants arbitrarily excluded reasonable non-tolled alternatives, it offers no record citation to identify an alleged option that was reasonable but ignored by defendants. And, in any event, it is apparent that no non-tolled alternative was both financially feasible and able to meet the Project's Purpose and Need Statement. *See Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, ___ F.3d ___, ___, 2014 WL 2782011, *18 (6th Cir. June 20, 2014) ("NEPA does not require [federal agencies] to pursue alternatives that present unique problems, or are impractical or infeasible.").

Furthermore, defendants evaluated both one- and two-bridge alternatives, and reasonably concluded that only a two-bridge alternative would adequately address the region's cross-river mobility needs. Defendants also carefully considered, but ultimately rejected, a light-rail option. The record shows that defendants rationally eliminated the alternatives preferred by plaintiff

because those alternatives would not satisfy the regionally-focused Purpose and Need Statement. Accordingly, defendants have discharged their duties under NEPA, and there are no grounds for us to conclude that defendants' evaluation of "reasonable alternatives" to the Project was arbitrary and capricious.

E.

The parties' final NEPA dispute concerns whether the Supplemental Final EIS was arbitrary and capricious because it did not sufficiently address (1) greenhouse gas emissions; (2) "ultra-fine" airborne particulates; (3) road runoff; (4) tunnel spoil; and (5) bridge piers. NEPA requires agencies to consider significant environmental effects of federal action and disclose them to the public; it does not require agencies to reach any particular decision. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *City of Riverview v. Surface Transp. Bd.*, 398 F.3d 434, 442 (6th Cir. 2005). In enacting NEPA, Congress "did not require agencies to elevate environmental concerns over other appropriate considerations." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). The agency need only take a "hard look" at the environmental consequences of its decision. *Id.*; *Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 418 (6th Cir. 2004). "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec.*, 462 U.S. at 97–98. In other words, we do not sit as a "super agency" and conduct a de novo review of the information received and considered by the agency. *Latin Americans*, ___ F.3d at ___, 2014 WL 2782011, *13.

In this case, throughout 258 pages in the "Environmental Consequences" chapter of the Supplemental Final EIS, defendants considered the potential environmental impacts of each

proposed alternative, including impacts on socio-economics, water quality, wetlands, air quality, endangered species, land use, historic resources, noise, and aesthetics. Over a number of years, defendants consulted numerous federal and state agencies in connection with their preparation of the Supplemental Final EIS. Given this record, we find that defendants fully discharged their duties under NEPA.

First, defendants adequately considered greenhouse gas emissions. Although defendants acknowledged that greenhouse gases, including those emitted by cars burning fossil fuels, contribute to climate change, the Supplemental Final EIS explained that it did not analyze the emission changes that would result from each proposed alternative in exhaustive detail because: (1) the EPA has the authority to regulate greenhouse gases and has chosen to execute that authority by directly regulating emissions from vehicles, rather than imposing requirements on transportation projects; (2) given the global nature of climate-change, decisionmakers would not be better informed by a discussion of how the proposed alternatives might vary in their relatively small contribution to a world-wide problem; and (3) the federal defendants are engaged in other efforts to help reduce greenhouse gas emissions. In short, defendants cannot usefully evaluate greenhouse gas emissions on a Project-specific basis because of the non-localized, global nature of potential climate impacts. *See Tinicum Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 296 (3d Cir. 2012) ("While additional data might enable a more detailed environmental analysis, NEPA does not require maximum detail. Rather, it requires agencies to make a series of line-drawing decisions based on the significance and usefulness of additional information."). Plaintiff offers nothing to rebut this rational conclusion. Accordingly, defendants' approach to greenhouse gas emissions was not arbitrary and capricious.

Second, defendants did not irrationally omit consideration of "ultra-fine" airborne particulates. The Supplemental Final EIS analyzed air quality impacts, focusing on the pollutants regulated by the Clean Air Act's National Ambient Air Quality Standards ("NAAQS"). "Ultra-fine" particulates are not regulated under the NAAQS. Nevertheless, and despite the lack of any other regulatory requirement or standards relating to "ultra-fine" particulates, plaintiff insists that NEPA required defendants to include an analysis of such emissions in the Supplemental Final EIS. Plaintiff cites no guidance document, case law, agency comment, or other authority to suggest that such an analysis is required under NEPA or is even technically feasible.[1] Moreover, the record shows that defendants consulted with the EPA throughout the preparation of the Supplemental Final EIS regarding the methodologies for various impact analyses—including air quality—and at no time did EPA suggest that defendants should analyze "ultra-fine" particulates. "While additional data might enable a more detailed environmental analysis, NEPA does not require maximum detail. Rather, it requires agencies to make a series of line-drawing decisions based on the significance and usefulness of additional information." *Tinicum Twp., Pa.*, 685 F.3d at 296. Under the circumstances presented, defendants reasonably decided not to analyze the environmental impacts of "ultra-fine" particulates.

Third, defendants took the requisite "hard look" at the environmental impacts of road runoff. Defendants conducted a thorough analysis of potential impacts to water quality, incorporated robust measures to minimize road runoff impacts, and responded directly to

---

[1]Notably, at least two courts have recognized that NEPA's requirements are per se satisfied by demonstrating conformity with NAAQS. *See Tinicum Twp. v. U.S. Dep't of Transp.*, 685 F.3d 288, 296–98 (3d Cir. 2012); *Sierra Club v. FHWA*, 715 F. Supp. 2d 721, 741 (S.D. Tex. 2010).

plaintiff's concerns about the potential discharge of road deicing fluids into Harrods Creek. The Final EIS acknowledged that de-icing compounds will be used seasonally and "would result in short-term concentration increases," but "due to the small quantities of such pollutants, no adverse impacts are anticipated[,]" and the Supplemental Final EIS explained that the drainage system for the Project will collect all runoff and store it in vaults prior to release into Harrods Creek. The Supplemental Final EIS also explained that this drainage system had been discussed with the Kentucky Division of Water and the Louisville Water Company—which operates the water system—and that they considered it "reasonable, acceptable, and of adequate design for the proposed project." Plaintiff offers no evidence to show that defendants' environmental impact analysis in this area was arbitrary or capricious.

Fourth, defendants sufficiently addressed tunnel spoil concerns. Both the Final EIS and the Supplemental Final EIS discussed potential impacts related to "tunnel spoil," i.e., disposal of excess excavation material. The Supplemental Final EIS states that because "excess material sites for disposal of construction spoil have not been determined at this time," those sites will be investigated later when a determination is made regarding construction phasing. Notwithstanding this statement, and citing no evidence in support of its position, plaintiff claims that defendants knew what the disposal sites would be and deliberately withheld that information during the NEPA process. Plaintiff's baseless accusation falls flat. Moreover, defendants rationally deferred a consideration of the environment impacts until the precise spoil locations would be identified. *See Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006) (if not enough information is available to permit a meaningful consideration of possible environmental impacts, NEPA does not require the government to do the impractical);

*see also Kleppe*, 427 U.S. at 402 (under NEPA, agencies need not consider potential effects that are highly speculative or indefinite).

Fifth, defendants took a "hard look" at the environmental impacts regarding bridge piers. The Final EIS acknowledged that "[p]lacement of bridge piers in a waterbody would lead to loss of habitat in the area of the piers, but would not substantially impair the function of the water body as a whole." Defendants also analyzed a reasonable range of roadway alignments, including alignments designed to lessen impacts to Harrods Creek. However, after testing each permutation against the Purpose and Need Statement, defendants ultimately selected a proposal that required bridge piers. Plaintiff offers no evidence to show that defendants acted without a rational basis. Additionally, plaintiff's claim that defendants deliberately delayed seeking permits under the CWA to postpone the release of the locations of bridge piers is unwarranted speculation that has no basis in the record.

## IV.[2]

### A.

The parties dispute whether plaintiff has created a genuine issue of material fact on its claim that various elements of the Project violate Title VI of the Civil Rights Act of 1964.[3] Section 2000d of the Act provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be

---

[2]Consistent with the district court's approach, the following analysis assumes arguendo that plaintiff has Article III standing to bring Title VI claims against the state defendants.

[3]Plaintiff argues in its reply brief that the district court dismissed its Title VI claims under Rule 12(c). Plaintiff is partially correct. The district court dismissed plaintiff's Title VI claims against the *federal defendants* under Rule 12(c), but granted summary judgment in favor of the *state defendants* on those same claims under Rule 56. Because plaintiff has abandoned all Title VI claims against the federal defendants, we review only the grant of summary judgment to the state defendants.

subjected to discrimination under any program or activity receiving Federal financial assistance."

To avoid summary judgment on a Title VI race discrimination claim,

> a plaintiff must create a genuine issue of material fact that the defendant intended to discriminate on the basis of race. To establish a genuine issue of material fact that the defendants intentionally discriminated against plaintiff[ ] on the basis of his race, plaintiff must demonstrate that the decision to exclude [plaintiff] from a federally financed program was motivated by race and that his race was a determining factor in the exclusion. In other words, proof of discriminatory intent is critical.

*Buchanan v. City of Bolivar*, 99 F.3d 1352, 1356 (6th Cir. 1996) (internal quotation marks and citation omitted).

Plaintiff offers a variety of circumstantial evidence in support of its Title VI claims. In the *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, the Supreme Court identified factors relevant to establishing a circumstantial inference of discriminatory animus. 429 U.S. 252 (1977). First, disparate racial impact may be a "starting point," but "impact alone is not determinative." *Id.* at 266. Second, the "historical background of the decision" may be relevant, "if it reveals a series of official actions taken for invidious purposes." *Id.* at 267. Third, the "sequence of events leading up [to] the challenged decision also may shed some light on the decisionmaker's purposes." *Id.* Fourth, "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." *Id.* Fifth, departures from established "substantive" standards "may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor" a different course of action than the one selected. *Id.* Finally, the "legislative or administrative history may be highly relevant," including "statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* at 268.

B.

In this case, plaintiff's evidence is insufficient to create a genuine issue of material fact on whether the state defendants intentionally discriminated on the basis of race in connection with the Project. Regarding the first *Arlington Heights* factor,[4] it is true that defendants have acknowledged that tolling will have a greater impact on minority and low-income populations. However, defendants explained the reasons why they ultimately found tolling to be necessary as a funding source, despite its disproportionately greater effects on low-income users of the transportation system, and included measures to mitigate the impact, including $20 million for enhanced bus service. Evidence of disparate impact alone is insufficient to justify an inference of discriminatory intent, unless the type of impact is significant, stark, and unexplainable on other grounds. *See Arlington Heights*, 429 U.S. at 266; *Wilson v. Collins*, 517 F.3d 421, 432 (6th Cir. 2008); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 276 (6th Cir. 1994). Plaintiff's disparate impact evidence falls far short of meeting the exception to the general rule, which the Supreme Court has reserved for cases such as *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (boundary change to city, eliminating all but 5 of 400 black voters from city), or *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (ordinance enforced against laundries owned by Chinese citizens). Further, plaintiff asks the court to draw an unreasonable inference from the evidence: because defendants acknowledged the disproportionate effects of tolling, they intentionally discriminated on the basis of race. This non sequitur does not create a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (at the summary

---

[4]Because plaintiff structures its arguments around the *Arlington Heights* factors, our analysis follows plaintiff's lead.

judgment stage, the plaintiff receives the benefit of any *reasonable* inferences that the facts permit).

Moreover, the historical background of the Project does not reveal any discriminatory intent. Arguing otherwise, plaintiff presents "evidence" that (1) white transportation planners were insensitive to the problems of "urban core blacks" because the ORMIS study—upon which the Project is based—did not specifically mention Title VI and (2) the Project itself is evidence of intentional discrimination because it involves tolls that disproportionately affect minorities and is not expected to increase "urban core employment." These conclusory allegations are insufficient to create a genuine issue of material fact on whether the Project's background includes a series of official actions taken for invidious purposes. To the contrary, the record demonstrates that the need for tolling arose from funding shortfalls, not because defendants intentionally discriminated against Title VI populations. No rational factfinder could conclude otherwise.

Next, the sequence of events leading up to the Project's approval does not demonstrate a discriminatory purpose. "Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (internal quotation marks and citation omitted). The mammoth Administrative Record, which chronicled the history of the Project in exhaustive detail, compels a reasonable factfinder to conclude that the Project was motivated by the nondiscriminatory purpose of improving cross-river mobility, not racial animus. The need to construct additional bridges for cross-river mobility has been recognized for nearly fifty years, and the Purpose and Need Statement

substantiates the acute and growing need to address cross-river traffic congestion and safety and inefficient cross-river mobility for population and employment growth in the region. Also, the alternatives evaluation demonstrates that the Modified Selected Alternative was chosen because it best addresses the identified needs, not because of any intentional discriminatory impacts. No reasonable jury would find anything about the "sequence of events" leading up to the Project's approval suggestive of discriminatory purpose.

In addition, there is simply no evidence of any departure from established procedures or substantive standards that might support an inference of intentional race discrimination. Defendants complied with the established procedures for review of the Project, including the procedural and substantive requirements for evaluating environmental justice impacts in Executive Order 12898, FHWA Order 6640.23, and DOT Order 5610.2. These procedures included extensive efforts to inform and encourage participation by members of low-income and minority communities.

Finally, the Administrative Record is highly relevant in this case because it contains no evidence that defendants' decision to approve the Project was motivated by an intent to disadvantage the Title VI population. Although plaintiff argues otherwise, its conclusory allegations of racial discrimination are undermined by the record. For two specific examples, the record shows that the Supplemental Final EIS included commitments to provide (1) $1.5 million for a Disadvantaged Minority Craftsman Training Program to train individuals in the techniques and skills required for historic preservation and rehabilitation, and (2) $10 million to rehabilitate the Trolley Barn in West Louisville to serve as the location for the Kentucky Center for African-American Heritage.

In sum, after sifting out plaintiff's rhetoric, legal conclusions, and unsupported allegations, the record facts that remain—viewed collectively, and in a light most favorable to plaintiff—do not create a genuine issue of material fact on whether the state defendants intentionally discriminated on the basis of race in connection with the Project.

V.

For the foregoing reasons, we affirm the judgment of the district court.